Frances I. COLEMAN, Plaintiff,

v.

**PRUDENTIAL RELOCATION,**
Defendant.

Willie M. BROWN, Plaintiff,

v.

**PRUDENTIAL RELOCATION,**
Defendant.

Donald C. BOWEN, Plaintiff,

v.

**PRUDENTIAL RELOCATION,**
Defendant.

David W. BALCER, Plaintiff,

v.

**PRUDENTIAL RELOCATION,**
Defendant.

Anne M. STROMICK, Plaintiff,

v.

**PRUDENTIAL RELOCATION,**
Defendant.

Nos. 95–CV–6430L through 95–CV–6434L.

United States District Court,
W.D. New York.

Aug. 25, 1997.

Jennifer L. Fazio, Marianetti & Associates, Rochester, NY, Donna Marianetti, Gallo & Iacovangelo, Rochester,NY, for plaintiffs.

Timothy Patrick Sheehan, Hodgson, Russ, Andrews, Woods & Goodyear, Rochester, NY, John Hamlin, Paul, Hastings, Janofsky & Walker, Stanford CT, for defendant.

*DECISION AND ORDER*

LARIMER, Chief Judge.

These five actions were commenced by five individual plaintiffs against defendant Prudential Relocation ("Prudential"). All five actions arise out of a reduction in force ("RIF") at Prudential in January 1995, which resulted in the termination of plaintiffs' employment. Plaintiffs allege that they were terminated on account of their age and for other discriminatory reasons. Prudential has moved for summary judgment. Because these cases involve many of the same facts and legal issues, for purposes of this Decision and Order I am consolidating these cases pursuant to Rule 42(a) of the Federal Rules of Civil Procedure, which permits consolidation "of any or all the matters in issue" in "actions involving a common question of law or fact . . ."

## FACTUAL BACKGROUND

Prudential is a business that provides various services to individuals and institutions relating to the relocation process. For example, Prudential assists persons who are relocating in finding new homes, moving their household goods, and so on.

In 1993, Eastman Kodak Company ("Kodak"), which until then had maintained its own in-house relocation department, decided to out source its relocation functions. Kodak selected Prudential to take over its relocation functions.

When it announced its decision to out source these functions, Kodak gave its employees who had been in its in-house relocation department two options: either attempt to obtain other employment within Kodak; or apply to Prudential for employment. Plaintiffs all chose the latter course, and did obtain positions at Prudential. Plaintiffs Frances I. Coleman, Willie M. Brown and Anne M. Stromick accepted positions as relocation counselors in November 1993, at which time they were fifty-one, forty-nine and for-

ty-two years old respectively. Plaintiffs David W. Balcer and Donald C. Bowen accepted positions as team leaders in November and December 1993, at which times they were forty and thirty-nine years old respectively.

In June 1994, Kodak announced that it intended to divest itself of certain divisions so that it could concentrate on its "core" business. As a result, the number of relocations of Kodak employees dropped dramatically, and Prudential's business correspondingly decreased as well. Eventually Prudential's management decided that it would be necessary to reduce its staffing at its Kodak relocation center ("the center") from nineteen to ten employees.

A plan for deciding who would be terminated was developed by Carolyn Roth, Prudential's Vice President of Client Services; James Mayer, the Director of the center; and Marcia Mains Garcia, a team leader at the center. Employees were to be ranked based upon four criteria: quality of customer service; focus on results; ability to complete tasks under pressure and work in a timely fashion; and adherence to core values and company policy.

The RIF plan was finalized in late 1994. Nine employees, including all five plaintiffs, were selected for termination out of a total workforce of nineteen employees. Defendant contends that plaintiffs were selected for discharge because they scored lower than other employees in the ranking process. The terminations were effective in January 1995.

Plaintiffs filed these actions on September 1, 1995. All five plaintiffs assert causes of action under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the New York State Human Rights Law ("HRL"), N.Y. Exec. L. § 296.[1] In addition, plaintiff Brown, who is African–American, asserts a claim of race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the

---

**1.** The complaints also purport to state claims of age discrimination under Title VII. Title VII does not apply to age discrimination claims, however. Moreover, it is well established that the ADEA provides the exclusive remedy for age discrimination. *See, e.g., Zombro v. Baltimore City Police*

*Dep't,* 868 F.2d 1364, 1369 (4th Cir.), *cert. denied,* 493 U.S. 850, 110 S.Ct. 147, 107 L.Ed.2d 106 (1989); *Ray v. Nimmo,* 704 F.2d 1480, 1485 (11th Cir.1983); *Paterson v. Weinberger,* 644 F.2d 521 (5th Cir.1981).

HRL. Plaintiffs Balcer and Bowen, who are both males, assert claims of sex discrimination under Title VII. Plaintiff Bowen also asserts a claim of retaliation under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.,* and a claim under New York law for intentional infliction of emotional distress.

## DISCUSSION

### I. General Principles

Except for Bowen's claim for intentional infliction of emotional distress, all the claims here are subject to a similar mode of analysis, which is that set forth by the Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Plaintiffs must first establish a case of discrimination (or retaliation). The burden of production then shifts to defendant to articulate a legitimate, lawful reason for its action. Plaintiffs then have the burden of proving that defendant's stated reason is in fact a pretext for discrimination or retaliation. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 503–08, 113 S.Ct. 2742, 2746–47, 125 L.Ed.2d 407 (1993); *Fisher v. Vassar College,* 114 F.3d 1332, 1335–36 (2d Cir.1997) (en banc). Once the party moving for summary judgment has met its burden; then, plaintiffs "must do more than present 'conclusory allegations of discrimination,'" *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), and must offer "concrete particulars" showing that there are genuine issues of material fact concerning their claims. *Id.; Viola v. Philips Med. Systems of North America,* 42 F.3d 712, 716 (2d Cir.1994).

To make out a *prima facie* case of discriminatory discharge under the ADEA, Title VII, or the HRL, plaintiffs must show four elements: (1) that they belonged to a protected class; (2) that they were qualified for their positions; (3) that they were discharged; and (4) that the discharges occurred in circumstances giving rise to an inference of discrimination. *Fisher,* 114 F.3d. at 1335; *Woroski v. Nashua Corp.,* 31

F.3d 105, 108 (2d Cir.1994). To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must show that he engaged in activity protected by the FMLA, that he was subjected to an adverse employment action, and that there is a causal connection between the protected activity and the adverse action. *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1325 (10th Cir.1997); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308 (2d Cir. 1995) (Title VII case).

In the cases at bar, all five plaintiffs belong to a protected class. They were all at least forty years old when they were terminated, and they are also protected under Title VII based on their sex and race. They were also all discharged. Whether they were qualified for their positions, or whether the circumstances surrounding their discharges were suggestive of discrimination, is in dispute. Defendant also contends that Bowen did not engage in activity protected by the FMLA. Since defendant has proffered legitimate, nondiscriminatory reasons for discharging plaintiffs, however, I will assume that plaintiffs have made out a *prima facie* case of discrimination and retaliation and proceed to analyze their allegations of pretext. *See United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) ("Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant. The district court has before it all it needs to decide whether 'the defendant intentionally discriminated against the plaintiff'") (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093); *EEOC v. Ethan Allen, Inc.,* 44 F.3d 116, 119 (2d Cir.1994).

### II. Coleman's Claim

Plaintiff Coleman asserts a single claim of age discrimination under the ADEA. She alleges that defendant subjected her to harassment during the year prior to her termination in an effort to induce her to resign voluntarily. When plaintiff did not do so, she alleges that defendant gave her an unjustified negative rating during the RIF process in order to justify terminating her.

Defendant contends that it had legitimate reasons for terminating Coleman. Defendant asserts that Coleman was unhappy working at Prudential, and that this led her to take a hostile attitude toward her supervisors, coworkers and clients. Defendant states that Coleman was often argumentative and was prone to losing her temper, even in the presence of clients. Defendant contends that it received complaints about Coleman from Kodak transferees, and that as a result, Coleman was counseled about her poor attitude as early as February 1994. Defendant contends that matters did not improve, and that in September 1994, survey results indicated that Coleman's rate of transferee satisfaction stood at sixty-four percent. Defendant's Ex. W. While this number rose to seventy-three percent by October 1994, it remained far below her target of ninety-five percent. Defendant's Ex. X.

Because of these ongoing problems, defendant states that Coleman was put on probation effective July 13, 1994. On that date, Mayer informed Coleman in a memorandum that he was concerned that Coleman was "carrying around the baggage of frustration stemming from the transition from Kodak to Prudential," and that this "produce[d] continuing negative attitudes and [would] lead to less than satisfactory service evaluations." Defendant's Ex. S.

Coleman's problems continued, however, to the point that on October 15, 1994, she wrote a ten-page memo to Rosemary Moreno in Prudential's Human Resources department admitting that her "emotions rise right to the surface and [she could] not control them," but that she felt compelled to "stat[e][her] case in [her] defense." Defendant's Ex. N.

In November 1994, Mayer prepared Coleman's 1994 performance appraisal, which was approved by Coleman's supervisor Carolyn Roth. Mayer stated that plaintiff needed to improve in several areas, particularly client satisfaction. Many of his comments were positive, but he noted that Coleman could be "abrupt at times" and tended to "get flustered under pressure." Her overall rating was two out of five, which translated to "needs improvement." Defendant's Ex. X.

When Prudential decided to implement the RIF, Mayer and Mains Garcia worked together in ranking the employees. Mayer then forwarded the recommendations to Roth, who in turn submitted them to Charles Morris, Prudential's President for the Northeast Region. Morris approved the plan.

The employees were ranked by numbers assigned to them from one to five for a number of criteria, with five being the best score. Coleman's total was thirty-seven, which put her sixteenth out of the eighteen employees evaluated.[2] Defendant's Ex. F. Defendant contends that this appraisal system was fair and honest, and that plaintiff's termination was solely the result of her poor score relative to the other employees.

■ Defendant having proffered a legitimate, nondiscriminatory reason for its actions, the burden is upon plaintiff to demonstrate that there exist genuine issues of material fact about whether defendant's stated reason is a pretext for age discrimination. I find that she has failed to do so.

Plaintiff's chief argument in response to defendant's contentions is that the factors relied upon by Prudential are subjective and inaccurate. Even if true, however, this largely conclusory assertion is not probative of age discrimination. The laws prohibiting discrimination in employment were "not intended to transform the courts into personnel managers." *Thornbrough v. Columbus and Greenville R.R. Co.*, 760 F.2d 633, 647 (5th Cir.1985). The Second Circuit has reminded district courts that they do not have a "roving commission to review business judgments," *Montana v. First Fed. Savings and Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir.1989) (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 n. 8 (7th Cir.1987)), and that they "must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process." *Meiri*, 759 F.2d at 995. Thus, the mere fact that some of the criteria on which plaintiff was evaluated may have been subjective or subject to inaccuracies

---

**2.** Mayer, the nineteenth employee at the center, was not evaluated.

does not in any way suggest that defendant was motivated by a discriminatory animus.

Plaintiff also asserts that defendant has made contradictory assertions about whether Coleman was terminated because of her performance. Plaintiff bases this contention on a single statement made by Roth at her deposition, that "nobody was terminated for performance." Plaintiff's Ex. 4 at 48. Plaintiff, however, has taken this statement out of context. It is clear from the transcript that all Roth meant was that had it not been for the RIF, none of those who were terminated would have been fired, and that "they would all be eligible" for rehire. *Id.* To the extent that plaintiff's performance relative to that of her coworkers affected her ranking during the RIF selection process, however, it was a factor in the decision to terminate her. That fact is not contradicted by Roth's statement.

■ Plaintiff also states that prior to the RIF, Prudential employed eight non-managerial employees over the age of forty, and that after the RIF, Prudential retained two employees over the age of forty. Considering that only nineteen employees were involved in the first place, however, and that only ten remained after the RIF, this small sample size renders this statistical evidence practically meaningless. *See Mayor of City of Philadelphia v. Educational Equality League,* 415 U.S. 605, 621, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974) (statistics regarding racial composition of thirteen-member school board nominating panel were meaningless); *Pitre v. Western Elec. Co.,* 843 F.2d 1262, 1268 (10th Cir.1988) (sample sizes ranging from two to twenty-four people were too small to produce meaningful use of statistics); *Haskell v. Kaman Corp.,* 743 F.2d 113, 121 (2d Cir.1984) (ten terminations over eleven-year period too small to permit inference of discrimination); *Pace v. Southern Ry. Sys.,* 701 F.2d 1383 (11th Cir.) (affirming summary judgment for defendant in ADEA case, citing lack of probative value of plaintiff's statistics due to small sample size), *cert. denied,* 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983).

When asked at her deposition why she believed that she had been discriminated against on account of her age, plaintiff responded: "The fact that I'm no longer there, the fact that I believe that I was one of the highest paid people in there, and with pay and age, they are synonymous. They often go together." Defendant's Ex. D at 148. Aside from the fact that plaintiff has presented no evidence to support her subjective belief that her salary was a factor, the Second Circuit has recently noted that "[u]nder *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 611–12, 113 S.Ct. 1701, 1706–07, 123 L.Ed.2d 338 (1993), an employer's concern about the economic consequences of employment decisions does not constitute age discrimination under the ADEA, even though there may be a correlation with age. *Hazen* made clear that employment decisions driven by factors that are empirically intertwined with age are not discriminatory so long as they are motivated by 'some feature other than the employee's age.' *Id.* at 609, 113 S.Ct. at 1705. Thus, decisions motivated by economic concerns do not violate the ADEA." *Criley v. Delta Air Lines, Inc.,* 119 F.3d 102, 103 (1997).

Plaintiff also stated that she was told by plaintiff Bowen at one point that at a meeting with him, Mayer and Morris, Morris expressed a desire to demote Coleman, and that Mayer stated, " 'What can we do with Fran at her age,' or 'What can Fran do at her age,' that sort of thing." Defendant's Ex. D at 149. It does not appear that this meeting was in any way connected with or temporally close to the RIF, however, and as virtually the only evidence of discriminatory animus, it is simply too little to preclude summary judgment. *See Philipp v. ANR Freight Sys., Inc.,* 61 F.3d 669, 674 (8th Cir.1995) (agreeing with district court that the record was "devoid of evidence showing a 'specific link ...' " between supervisor's reference to plaintiff as "the old man" and plaintiff's termination) (quoting *Stacks v. Southwestern Bell Yellow Pages, Inc.,* 996 F.2d 200, 201 n. 1 (8th Cir.1993)); *Thomson v. Saatchi & Saatchi Holdings (USA), Inc.,* 958 F.Supp. 808, 824 (W.D.N.Y.1997) (single remark by supervisor about plaintiff's coworker that supervisor was going to "get rid of the old guy because he was over the hill" was insufficient to raise issue of fact about

whether plaintiff was terminated on account of his age); *Waldron v. SL Indus., Inc.*, 849 F.Supp. 996, 1004 n. 11 (D.N.J.1994) (comment by supervisor that plaintiff should lose weight because it would make him feel better and "look younger" "in no way indicate[d] that plaintiff's termination was motivated by age," since it was made five months before termination and was not tied in any way to his continued employment).

It should also be noted that not only has plaintiff not presented any significant evidence of pretext, but that the facts of this case in some ways affirmatively indicate the *lack* of any discriminatory animus on Prudential's part. For one thing, plaintiff began her employment with Prudential in December 1993, and was terminated about thirteen months later, in January 1995. The complaint alleges that "[i]n the one (1) year period prior to Plaintiff's termination, Plaintiff underwent a course of harassment directed against her by the Defendant which Plaintiff believes was intended to cause Plaintiff dissatisfaction with her employment so that she would quit her position with the Defendant." Complaint ¶ 24. To accept the truth of this allegation, then, one would have to believe that Prudential hired Coleman, and almost immediately thereafter began harassing her so that she would quit.

Similarly, it is noteworthy that Coleman was fifty-one years old when she was hired. Although as plaintiff notes, her membership in the protected class at the time of her hire does not preclude her as a matter of law from bringing an ADEA claim, it certainly strains credulity to think that Prudential "suddenly developed an aversion to older people" within a year after hiring plaintiff. *Miller v. Citizens Sec. Group, Inc.*, 116 F.3d 343, 348 (8th Cir.1997) (affirming summary judgment for employer who hired plaintiff at age fifty-five or fifty-six, and fired him three years later); *accord Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1147 (7th Cir.1994); *See also Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991) ("[i]t hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job") (quoting John J. Donohue

III & Peter Siegelman, *The Changing Nature of Employment Discrimination Litigation*, 43 Stan.L.Rev. 983, 1017 (1991)).

Plaintiff also alleges, as evidence of her competence at her job, that she received a performance-based bonus about six months prior to her termination. Complaint ¶ 23. That is hardly consistent, however, with her claim that Prudential tried to induce her to quit her job or that Prudential concocted inaccurate negative reviews of her performance. Furthermore, as already noted, Coleman was not actually fired for poor performance; she was simply among those selected for termination in the RIF. In short, the evidence simply does not support plaintiff's claim.

### III. Brown's Claims

#### A. Factual Background

Plaintiff Brown is a black female. She alleges a claim of age discrimination under the ADEA, and race discrimination under Title VII. She claims that despite her satisfactory performance as a relocation counselor, Prudential deliberately gave her a negative performance appraisal to justify her termination in the RIF.

Defendant contends that there were problems with Brown's performance during her employment at Prudential. Defendant claims that Brown had difficulty handling even moderately heavy workloads, and that she did not work as efficiently as she should have, with the result that some of her duties had to be reassigned to other employees. Defendant also asserts that plaintiff was not a "team player," and notes that plaintiff admitted in her deposition that although she believed that she had a good rapport with her coworkers, she "kept to [her]self" and "did not mesh with the group and what have you, which [she] felt [she] had a perfect right to do." Defendant's Ex. D at 139. Defendant further contends that plaintiff was sometimes abrasive with her coworkers and tended to be argumentative, which Mayer noted in Brown's November 1994 performance appraisal. Defendant's Ex. M. Brown's overall rating in that appraisal was a

two, which translated to "needs improvement."

In the employee rankings prepared in anticipation of the RIF, Brown received a total score of thirty-eight, which placed her fifteenth out of the eighteen employees evaluated. Defendant contends that this was the reason for her termination, along with the fact that her experience was mostly in the area of counseling temporarily reassigned clients in the area of renting, which was a relatively small aspect of Prudential's business. Defendant states that after the RIF was announced, one of the remaining employees, Jacqueline Rohr, approached Mayer and volunteered to take over plaintiff's temporary-assignment duties because Rohr stated that her own administrative duties did not keep her very busy. After plaintiff's termination, those duties were assigned to Rohr, a white woman who plaintiff alleges is younger than she.

### B. Age Discrimination Claim

■ In support of her age discrimination claim, Brown relies on virtually the same evidence submitted by Coleman, mostly assertions that Prudential's employee appraisal and ranking process was flawed. That does not show that Prudential's proffered reasons for terminating Brown are pretextual. Furthermore, even if plaintiff could show an issue of fact about whether Prudential's stated reason is pretextual, the Second Circuit has made clear that plaintiff must go beyond that and show that there are issues of fact about whether Prudential's true reason was age discrimination. *Fisher*, 114 F.3d at 1339. Plaintiff has not done so.

The only specific evidence Brown has regarding her ADEA claim is the fact that her duties were taken over by a younger woman. That fact might establish the fourth element of plaintiff's *prima facie* case, but establishing the "minimal requirements" of a *prima facie* discrimination case does not necessarily mean that the plaintiff's case is strong enough to withstand summary judgment. *Fisher*, 114 F.3d at 1336–37 (establishment of *prima facie* case does not automatically mean that plaintiff can avoid directed verdict). If plaintiff's case could survive a sum-

mary judgment motion merely because her duties were assumed by a younger person, that would mean that "virtually every employee over forty years old [who was terminated and whose duties were assigned to someone younger] could state an age claim that would withstand summary judgment. Such a holding would be tantamount to saying that a *prima facie* case would always suffice to raise issues of fact about the truth of the employer's proffered reason, which would render the *McDonnell Douglas/Burdine* analysis pointless." *Hambas v. Board of Trustees, State Univ. of New York*, No. 93–6467, slip op. at 10 (W.D.N.Y. Nov. 7, 1996), *aff'd*, 116 F.3d 465 (2d Cir.1997); *Futrell v. J.I. Case*, 38 F.3d 342, 348 (7th Cir. 1994) ("Typically, younger workers will replace older ones; this is an unremarkable phenomenon that does not, in and of itself, prove discrimination"); *Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 661 (7th Cir.1993) ("While there are numerous ways to prove pretext, Monaco simply relied on the evidence he used to establish his *prima facie* case, i.e., the fact that [a supervisor] made ageist remarks and that he was replaced by a younger individual. This he may not do") (citations omitted); *Ragland v. Rock–Tenn Co.*, 955 F.Supp. 1009, 1022 (N.D.Ill.1997) (replacement by younger person, standing alone, is insufficient to show pretext).

### C. Race Discrimination Claim

■■ In support of her race discrimination claim, Brown relies upon two sets of facts. First, she notes that prior to the RIF, there were two African–Americans employed at the center, both of whom were terminated in the RIF. For the same reasons stated with respect to plaintiffs' statistical evidence of age discrimination, however, the numbers of people involved here are simply too small to be of any probative value. *Educational Equality League*, 415 U.S. at 621, 94 S.Ct. at 1333. In addition, the fact that Rohr took over Brown's duties after the RIF is simply an unremarkable byproduct of the RIF. This is not a case in which the plaintiff was fired and a white person was hired to replace her; plaintiff's position was simply eliminated and her duties assumed by Rohr. A

"person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir.), *cert. denied*, 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990).

■ The other evidence plaintiff offers in support of her race discrimination claim involves comments made by Mains Garcia in the Summer of 1994. At a meeting, Mains Garcia announced a new "team player of the month award." Before she had finished her presentation, plaintiff voiced her objection to the program, stating that she thought it was unfair "because [Brown] was an entity all by [her]self," and that she therefore "had no opportunity of participating in the award incentive ..." Brown Deposition at 142. Mains Garcia became upset and walked out of the meeting.

Plaintiff Coleman testified at her deposition that later that day, she approached Mains Garcia to talk to her because Coleman "felt bad" for her. She stated that Mains Garcia said to her, "That black bitch pissed me off." Coleman Deposition, July 3, 1996, at 122–23. Plaintiff Balcer also testified that he later overheard Mains Garcia say to another employee, "I'm sick of that nigger," referring to Brown. Balcer Deposition at 215.

While unquestionably offensive, these remarks do not support plaintiff's claim of discriminatory discharge. I recognize that these statements are some evidence of discriminatory animus on the part of Mains Garcia. In addition, defendant concedes that Mains Garcia gave Mayer some input when the center's employees were ranked in preparation for the RIF. Mayer Deposition at 100; Roth Deposition at 60; Mains Garcia Deposition at 52–57.

■ Proof of pretext, however, cannot rest upon "statements by nondecisionmakers, or statements by decisionmakers *unrelated to the decisional process itself ...*" *Price*

*Waterhouse v. Hopkins*, 490 U.S. 228, 277, 109 S.Ct. 1775, 1804–05, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring; emphasis added). "Unless the remarks upon which plaintiff relies were related to the employment decision in question, they cannot be evidence of a discriminatory discharge." *McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686 (7th Cir.1991). Therefore, "[t]o be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process." *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir.1996). Without some nexus between the comments and the discharge, then, "[e]vidence of a supervisor's occasional or sporadic use of a slur directed at an employee's race, ethnicity, or national origin is generally not enough to support a claim under Title VII." *Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1266 (7th Cir.1993), *cert. denied*, 511 U.S. 1005, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994).

In *Gartman v. Gencorp Inc.*, 120 F.3d 127 (8th Cir.1997), for example, the female plaintiff testified that she was present when one of the defendant's vice presidents, upon being told that the company had hired a woman to fill a certain position, replied, "S—t, another gal." The vice president testified that he made the comment because he was frustrated by the poor performance of another woman at the company. *Id.*, 120 F.3d at 129. The vice president also testified that he had taken part in the decision to offer the plaintiff a transfer to another plant, which the plaintiff alleged constituted a constructive discharge. Noting that "the comment at issue was made months before the transfer offer," however, the Eighth Circuit held that the vice president's "impulsive remark, uttered in a passing moment of frustration, bore no relation to the decisional process itself," and was therefore not probative of whether plaintiff was discriminated against. *Id.* at 131. *See also Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 97 (1st Cir.1996) (holding that plaintiffs "ha[d] failed to show what we consider to be the necessary link between the speakers' statements [about a 'black mafia'] and the decision to terminate [plaintiffs'] employment"); *Philipp*, 61 F.3d at 674 (no link between supervisor's reference to plaintiff as

"the old man" and plaintiff's termination); *Kriss v. Sprint Communications Co., Ltd. Partnership,* 58 F.3d 1276, 1281–82 (8th Cir. 1995) (supervisor's rude comments about certain female employees, including calling one of them a "bitch," were little more than statements by decisionmakers unrelated to the decisional process); *Nawrocki v. Daeman College,* No. 95–CV–0618E, 1997 WL 211338 *3 (W.D.N.Y. Apr.25, 1997) (supervisor's references to plaintiff as a "Polack" "were not temporally proximate to the discharge and were unrelated to the decisional process itself," and hence did not support claim of discriminatory discharge).

The alleged statements by Mains Garcia were made several months before Brown's termination, and they related to a single incident in which Mains Garcia was angered by Brown's behavior. Standing alone, they do not constitute evidence that plaintiff's discharge was the result of race discrimination.

## IV. Bowen's Claims

### A. Factual Background

Plaintiff Bowen asserts claims of age discrimination, sex discrimination, FMLA retaliation, and intentional infliction of emotional distress. He alleges that Prudential first demoted him, and then terminated him, on account of his age and sex, and because he had taken medical leave to attend to his seriously ill parents. He also alleges that certain persons at Prudential took actions that were deliberately designed to upset and embarrass him, including falsely accusing him of fraud and branding him a "security risk."

Bowen began his employment with Prudential as a team leader in December 1993. Defendant alleges that shortly thereafter, problems arose with Bowen's performance. He displayed poor interpersonal skills, and complained about many aspects of his job. As early as February 1994, Bowen met with Mayer because by plaintiff's own admission, he had "reached a boiling point" about various matters. Defendant's Ex. L. Some of the staff members under Bowen's supervision, including plaintiff Coleman, complained

about his lack of leadership. Defendant's Ex. P.

Defendant also asserts that Bowen spent too much time on issues concerning client transferee's tax matters, which had been a major part of his duties while he was employed at Kodak. Tax issues were not a significant part of Bowen's duties at Prudential however, and although he was told more than once to spend less time on tax matters, he continued to devote much of his time to taxes.

In the Spring of 1994, Prudential named Mains Garcia as a second team leader at the center, and she took over supervision of all relocation counselors, leaving Bowen with supervision of only four support staff members. In August 1994, Mayer and Roth told Bowen that he was being demoted to relocation counselor because of his inadequate performance as team leader.

Defendant alleges that even after his demotion, Bowen continued to perform unsatisfactorily. His caseload consistently remained far below his target, and he allegedly made some significant errors, such as mistakenly listing a $372,000 property for $179,000. Defendant also contends that although Prudential never refused to give him time off to care for his parents, Bowen also took unauthorized leave for reasons unrelated to his parents, and that he would sometimes simply disappear for hours at a time with no explanation.

In his November 1994 performance appraisal, Bowen's overall performance rating was a two, which translated to "needs improvement." The appraisal described Bowen as a "loner" who lacked "team spirit." Defendant's Ex. S. In the rankings made in anticipation of the RIF, Bowen ranked seventeenth out of the eighteen employees evaluated, and he was terminated effective January 20, 1995.

### B. Age Discrimination Claim

In support of his age discrimination claim, Bowen relies on the same general evidence as Coleman and Brown. He has not presented a shred of particular evidence suggesting that he was discriminated against on account

of his age. For the reasons stated with respect to the other plaintiffs' age claims, then, I grant defendant's motion for summary judgment on Bowen's age discrimination claim.

## C. Sex Discrimination Claim

 The sole basis for Bowen's claim of sex discrimination is that all the men at the center were terminated in the RIF. While that sounds highly significant, the probative value of that evidence, like that of the statistical evidence of age discrimination, is greatly diminished by the small numbers of people involved. Of the nine people terminated, three were male, and six were female. In addition, Mayer (who was one of the primary decisionmakers with respect to Bowen's termination) remained as Director of the center.

Even if this evidence could suffice to make out the fourth element of a *prima facie* case—a debatable proposition—it certainly is insufficient to give rise to a genuine issue of fact concerning whether defendant's proffered reason for terminating Bowen is a pretext for sex discrimination. It is no more probative of sex discrimination than the fact that both black employees were terminated is probative of race discrimination. Defendant is therefore entitled to summary judgment on this claim as well.

## D. FMLA Retaliation

Bowen alleges that one of the reasons for his termination was that he had taken absences to attend to his parents' needs. He claims that this violated the FMLA.

 Section 2612 of Title 29 provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period" for a number of reasons, including "to care for ... a ... parent[ ] of the employee, if such ... parent has a serious health condition." Section 2615 also makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this title."

As stated previously, one of the elements of plaintiffs *prima facie* case is to show that he engaged in activity protected by the act. The act provides a right to take leave only for "eligible employees." An "eligible employee" is defined as "an employee who has been employed ... for at least 12 months by the employer with respect to whom leave is requested ... and ... for at least 1250 hours of service with such employer during the previous 12–month period." 29 U.S.C. § 2611(2).

Plaintiff notes that at the time of his termination in January 1995, Bowen was protected by the FMLA. That is only part of the equation, however. Although he was protected by the Act in January 1995, what he was protected *from* was being retaliated against for having engaged in *protected* activity. By the terms of the statute, only an "eligible employee" can engage in protected activity. The parties agree that Bowen began his employment with Prudential on December 6, 1993. Therefore, he could not have engaged in activity protected by the FMLA until December 6, 1994 at the earliest.

The significance of this lies in the fact that defendant contends that the final determination of which employees to terminate in the RIF was finished by November 30, 1994. If true, that determination could not have been based on Bowen's engaging in protected activity.

Interestingly, plaintiff disputes defendant's assertion that the final determination was made by November 30, 1994; instead, plaintiff contends that "the ranking and selection of the particular employees for termination was finalized as early as *September of 1994.*" Plaintiff's Response to Defendant's Statement of Uncontested Facts ¶ 15 (emphasis added). Although the parties dispute the exact date, then, they are in agreement that the decision to terminate Bowen was made at some point prior to December 1, 1994, at which time Bowen remained unprotected by the FMLA. Therefore, plaintiff has not made out a *prima facie* case of retaliation under the FMLA.[3]

---

**3.** I also note that in neither the complaint nor in his affidavit does plaintiff allege that he had worked 1250 hours by the time of his termination. He merely makes the conclusory allega-

■ Even assuming *arguendo* that plaintiff has made out a *prima facie* case, I find that he has not shown the existence of any factual issues concerning whether Prudential's proffered reason for his termination is a pretext for retaliation. The only evidence Bowen has offered in this regard is a statement in his November 1994 performance review that he "seem[ed] to regularly have a 'need' to leave early. This was not looked on favorably when he was functioning in the Team Leader role." Defendant's Ex. S.

While arguably constituting some evidence that Bowen's medical leave absences were viewed with disfavor by Prudential, this single statement, in the context of the entire record, is insufficient to create an issue of fact that would justify denying defendant's motion and permitting this claim to go forward. For one thing, it is just one brief statement in a six-page performance review, most of which deals with other matters, such as client satisfaction, Bowen's inability to handle a heavy caseload, interpersonal relationships, etc. The record amply reflects that Bowen had continuing problems with his supervisors and others at the center for reasons unrelated to his taking medical leave, and in the face of that evidence, this single statement is insufficient to give rise to an inference of retaliatory discharge.

Secondly, plaintiff has not pointed to a single instance when he was refused permission to leave to care for his parents. I recognize that that is not a prerequisite to establishing a claim under the FMLA if in fact plaintiff was terminated because he took such leave, but the record is simply devoid of evidence that anyone at Prudential ever tried to make it difficult for him to take medical leave. Bowen testified that when he asked Mayer for time off, Mayer "sometimes would say yes. Other times, he would question me, and then I would try and stay as long as I could, work through my lunch hour, and then leave." Bowen Deposition at 101. That Mayer may sometimes have asked Bowen some questions about why he needed to leave, or whether he could stay at work for a

while longer is hardly unreasonable or indicative of a retaliatory motive. The fact that in spite of Mayer's questions, Bowen still took the afternoon off on those occasions indicates that he did not feel threatened by Mayer's questions. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat a well-founded summary judgment motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *Yerdon v. Henry,* 91 F.3d 370, 374 (2d Cir.1996). That is all that plaintiff has presented with respect to this claim, and accordingly the claim must be dismissed.

All of Bowen's federal claims having been dismissed, I decline to exercise jurisdiction over his claim under state law for intentional infliction of emotional distress. *See* 28 U.S.C. § 1367; *Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 104 (2d Cir. 1990) ("It is well settled that 'if the federal claims are dismissed before trial … the state claims should be dismissed as well'") (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)).

## V. Balcer's Claims

### A. Factual Background

Balcer began his employment at Prudential as a relocation counselor on December 6, 1993. Defendant contends that although Balcer was considered to be "personable," he had problems in the areas of responsiveness to client needs, organization, and attention to detail. Defendant asserts that transferees complained about his lack of responsiveness, particularly his failure to return telephone calls. This problem was reflected in a Monthly Management Update dated April 18, 1994. Defendant's Ex. P. Balcer also acknowledged at his deposition that he was counseled about this in April 1994, although he denied that the problem existed. Balcer Deposition at 152. Defendant states that

---

tion in his memorandum of law that he "clearly met the hours requirement." Plaintiff's Memorandum at 21. *See Spurlock v. NYNEX,* 949 F.Supp. 1022, 1033 (W.D.N.Y.1996) (dismissing

FMLA claim in part because plaintiff merely made conclusory assertion that he was eligible employee without alleging that he had worked for defendant for 12 months and 1250 hours).

despite this counseling, the problem continued.

Defendant also contends that Balcer demonstrated a lack of organizational skills, and that his files were not kept in good order. In addition, a September 1994 report indicated that customer surveys showed that forty percent of transferees with whom Balcer had dealt that year stated that they were either "dissatisfied" or "very dissatisfied" with his service. Defendant's Ex. S.

In June 1994, Balcer learned through a friend about an opening at Xerox Corporation ("Xerox") as an on-site relocation contact with Prudential. Because of his dissatisfaction with his employment at Prudential, Balcer decided to apply for the position, One David Garcia was ultimately selected to fill the position, however. Plaintiff alleges that Prudential persuaded Xerox to hire Garcia (whom plaintiff alleges was about twenty-four years old at the time) instead of Balcer.

In his November 1994 performance appraisal, Balcer was given an overall rating of two, which translated to "needs improvement." In the appraisal, Mayer again criticized Balcer's unresponsiveness to transferees and his lack of organization. Defendant's Ex. M. In the employee rankings prepared for the RIF, Balcer ranked eighteenth out of the eighteen employees evaluated. Defendant's Ex. H. He was terminated effective January 20, 1995.

## B. Age Discrimination Claim

■ Other than the evidence presented by the other plaintiffs that I have already found insufficient to support an age discrimination claim, the only evidence proffered by Balcer in support of this claim is his assertion that Prudential somehow got Xerox to hire Garcia instead of Balcer. I find this evidence equally inadequate to support this claim.

■ First, the only evidence plaintiff has offered to substantiate this allegation is his hearsay testimony that Glenda Nemus, a friend of his who was the wife of a Xerox relocation director told him that Gloria Bartholomew, Xerox's relocation manager, had told Nemus that "Prudential had made the decision to have Dave Garcia in there." Balcer Deposition at 189. Nemus allegedly also told him that it was "a matter of politics," and that "Gloria did not want to have somebody there who had a relationship with Glenda." Balcer Deposition at 190. This double hearsay is not sufficient to defeat defendant's motion. A party "cannot rely on inadmissible hearsay in opposing a motion for summary judgment, absent a showing that admissible evidence will be available at trial." *Burlington Coat Factory Warehouse v. Esprit De Corp.,* 769 F.2d 919, 924 (2d Cir.1985) (citations omitted). No such showing has been made.

Second, if, as plaintiff alleges, Prudential wanted to terminate him on account of his age (or for any other reason), it would have been illogical for Prudential to sabotage his attempt to leave Prudential to work at Xerox. If anything, this would have been a golden opportunity for Prudential to get rid of Balcer easily and amicably.

Third, even if Prudential was somehow responsible for Garcia getting the position, there is no evidence, aside from the fact that Garcia was younger than Balcer, that Balcer's age had anything to do with the matter. As already stated, losing out to a younger candidate, without more, is insufficient to show pretext. *Monaco,* 1 F.3d at 661.

## C. Sex Discrimination Claim

■ Balcer's claim of sex discrimination fails for the same reasons that Bowen's does. Balcer relies only on the fact that all three males other than Mayer were terminated, and on his contention that he was qualified for his position. As stated, the fact that, in a reduction from nineteen to ten employees, three males were terminated is of no statistical significance. In addition, though defendant alleges that Balcer had performance deficiencies that justified his low ranking, whether he was "qualified" for Title VII purposes is not the issue. Because this was a RIF, what mattered was not whether Balcer was *able* to do his job, but how well he did it *compared* to his coworkers. Defendant has proffered evidence that Balcer was relatively poorer at his job, and Balcer has not shown

any evidence that this is merely a pretext for sex discrimination.

## VI. Stromick's Claim

Plaintiff Stromick asserts a single claim of age discrimination. She began her employment at Prudential on December 6, 1993 as a relocation counselor. Prudential contends that throughout her employment there, her level of transferee satisfaction remained below the target rate of ninety-five percent. For example, a June 22, 1994 Monthly Management Update stated that her year-to-date satisfaction rate was seventy-eight percent. Defendant's Ex. R. That update also noted that transferees were "commenting on Anne and her lack of responsiveness and program knowledge." A September 22, 1994 Monthly Management Update stated that the satisfaction rate had risen to eighty-eight percent, but that was still below the target. Defendant's Ex. T.

On October 26, 1994, Stromick sent an e-mail message to Mains Garcia asking to meet with her regarding "2 surveys that brought [her satisfaction] average down." Defendant's Ex. U. She stated, "I used to get very complimentary letters and now I'm lucky if I get a decent (not excellent) survey."

Stromick's overall rating in her November 1994 performance appraisal was a three, which translated to "good." Defendant's Ex. Q. The appraisal noted that she "had some very difficult and demanding transferees," and that her transferee satisfaction rate was "steadily rising," but also stated that her "learning curve [wa]s slower than some of the others in the group," and that she "had a harder time relearning policies and procedures than some of the others who came over from Kodak." In the employee rankings prepared for the RIF, Stromick ranked twelfth out of the eighteen employees evaluated. Defendant's Ex. H. Stromick was terminated effective January 20, 1995.

Stromick offers no evidence in support of her claim of age discrimination other than the evidence that I have already found insufficient. In addition, when asked at her deposition if she was aware of any facts suggesting that age was a criterion in deciding who would be terminated, she responded that she "looked at the number that was laid off that were over 40, and [she] looked at the number that was left that were over 40, and it decreased significantly." Stromick Deposition at 140. When asked if she was aware of any other pertinent facts, she said, "No." *Id.*

As already stated, the mere fact that six out of eight persons over forty were terminated is statistically insignificant, considering that there were only nineteen employees in the center to begin with, and that the RIF brought that number down to ten. Without any additional evidence of age discrimination, this claim cannot stand.

Like all of plaintiffs' claims, then, this claim has no foundation in the record whatsoever. Plaintiffs may be frustrated at losing their jobs only a little over a year after they began working at Prudential, but that does not justify prosecuting "buckshot" claims of discrimination based on every protected class into which plaintiffs fall. The fact is, as plaintiffs concede, that some employees had to be laid off for economic reasons, and while plaintiffs are understandably unhappy that they were the ones chosen, their subjective beliefs that they were discriminated against are insufficient to support their discrimination claims.

## CONCLUSION

Defendant's motions for summary judgment in *Coleman v. Prudential Relocation, 95–CV–6430L (Item 18),* Brown v. Prudential Relocation, 95–CV–6431L (Item 17), *Bowen v. Prudential Relocation,* 95–CV–6432L (Item 17), *Balcer v. Prudential Relocation,* 95–CV–6433L, (Item 17), and *Stromick v. Prudential Relocation,* 95–CV–6434L (Item 26), are granted, and the complaints are dismissed.

IT IS SO ORDERED.