James J. O'SULLIVAN, Enrique Edwards, Lawrence Helfand, Thomas P. Mathews, Maureen A. Moccia, Kenneth J. Mooney, Howard Seiter, Benjamin Redmond, Sheila Mccue, Plaintiffs,

v.

THE NEW YORK TIMES, Defendant.

No. 96 CIV. 6143 LAP.

United States District Court,
S.D. New York.

March 16, 1999.

### MEMORANDUM and ORDER

PRESKA, District Judge.

Plaintiffs James J. O'Sullivan, Enrique Edwards, Lawrence Helfand, Thomas P. Mathews, Maureen A. Moccia, Kenneth J. Mooney, Howard Seiter, Benjamin S. Redmond and Sheila M. Mccue (collectively, "plaintiffs") bring this claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, the New York State Human Rights Law, N.Y.C. Admin. Code §§ 8–101, *et seq.*, the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1, *et seq.*, the Pennsylvania Human Relations Act, and the Connecticut Human Rights and Opportunities Law against defendant, The New York Times ("The Times" or "defendant"), alleging that on the basis of their age they were terminated from their positions in a reduction-in-force caused by the reorganization of the Circulation Department at The Times. Defendant now moves for summary judgment.

In reviewing (1) the details of the elaborate procedures whereby employees were evaluated during this reorganization and those who were to be terminated were chosen, and (2) plaintiffs' objections to those procedures and decisions, I note the Court's summary of certain applicable law in *Coleman v. Prudential Relocation,* 975 F.Supp. 234, 239 (N.D.N.Y.1997):

> The laws prohibiting discrimination in employment were "not intended to transform the courts into personnel managers." The Second Circuit has reminded district courts that they do not have a "roving commission to review

business judgments," and that they "must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision-making process."

*Id.* at 239–40 (citations omitted). Plaintiffs' objections to the decisions made by The Times amount to a difference of opinion as to (1) the procedure by which the decisions to terminate employees should have been made and (2) which employees should have been terminated.

Absent a legally cognizable civil rights violation, the running of the affairs of a business entity is for management, not for disappointed employees or their counsel. A simple disagreement over what constitutes good management is not a fair fight; management will always win. Moreover, it is not available to this Court to substitute its ideas of how to run a business for those of the managers duly vested with that responsibility, except where the basis for a management decision is shown to be an unlawful one. Because plaintiffs have not proffered any evidence from which a jury could find such an unlawful basis, defendant's motion is granted.[1]

## BACKGROUND

In October 1987, The Times began to experience a financial slide caused by decreasing advertising revenue. (Def. 56.1 Statement ¶ 4).[2] The recession of the early 1990's had a negative impact on the revenues, earnings and profitability of The Times. (*Id.* ¶ 5). In June 1994, The Times offered a voluntary buyout program for all employees in the Newspaper Division. (*Id.* ¶ 6). Following this buyout program, a new department was created called Customer Order Fulfillment ("COF"). (*Id.* ¶ 7). This new department resulted in the elimination of approximately 40 positions, the then-current holders of which were subsequently offered a transition package consisting of job counseling, career counseling, financial counseling, outplacement services and an extension of tuition assistance program eligibility. (*Id.* ¶¶ 8, 9).

In May 1995, the Circulation Department ("Circulation") had a total of 128 employees. (*Id.* ¶ 10). The Times determined that Circulation needed to be reorganized to decrease operating cost and staff. (*Id.* ¶¶ 11, 12). On May 19, 1995, William Pollak ("Pollak"), the Executive Vice President of Circulation, told Circulation employees that a decision had been made to reduce the staff. The reorganization would result in the elimination of 25 to 30 positions. (*Id.* ¶¶ 13, 14). Pollak asked Donna Miele ("Miele"), Vice President of Human Resources, to create a process to reduce the Circulation staff by means of a voluntary buyout (the "Buyout") similar to that which had been created for the COF. (Lauri Aff., Ex. D, p. 40). First, each employee in Circulation would be given an

---

1. In deciding this motion I have considered the following submissions: Defendant's Statement of Undisputed Material Facts ("Def. 56.1 Statement"); Affidavit of Kevin G. Lauri in Support of Defendant's Motion for Summary Judgment sworn to on January 15, 1998 ("Lauri Aff."); Affidavit of Donna Miele in Support of Defendant's Motion for Summary Judgment sworn to on April 10, 1998 ("Miele Aff."); Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.Mem."); Defendant's Reply Memorandum of Law in Support of its Motion for Summary Judgment ("Def. Reply Mem."); Reply Affidavit of Kevin G. Lauri in Support of Defendant's Motion for Summary Judgment sworn to on April 13, 1998 ("Lauri Reply Aff."); Plaintiffs' Statement of Material Facts ("Pl. Material Facts"); Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl. Opp.Mem."); Affidavit of Daniel J. Schneider in Opposition to Defendant's Motion for Summary Judgment sworn to on March 16, 1998 ("Schneider Aff.").

2. Plaintiffs have not submitted a separate statement of material facts as to which they claim a genuine issue exists or otherwise objected to Defendant's 56.1 Statement. Accordingly, all facts asserted in The Times' Rule 56.1 Statement are deemed admitted. *See* Local Rules for the United States District Courts for the Eastern and Southern Districts of New York, Civil Rule 56.1.

opportunity to fill out a qualification survey and meet with a human resources representative who would explain the survey that the employee had to fill out. Second, each employee's direct manager would be asked a series of questions and complete a performance review on each employee. Third, the vice-presidents would make the final termination decisions. (*Id.* at pp. 40–41). This process was developed to help select Circulation employees for lay-off in the event that 25 to 30 employees did not accept the Buyout. (Def. 56.1 Statement ¶¶ 16, 17). The Circulation employees were informed that the reduction of 25 to 30 employees would be accomplished by (1) eliminating ten to fifteen Home Delivery Managers who were supervising two to three employees each; (2) eliminating ten to fifteen Circulation Sales Representatives ("CSRs")[3]; and (3) reducing support staff by between five and ten positions. (*Id.* ¶ 22).

On June 20, 1995, each employee was sent a self-evaluation form regarding his/her abilities and performance at The Times. Employees were offered a training session to assist them in filling out the survey and were also given an opportunity to discuss the survey one-on-one with a Human Resources representative. (*Id.* ¶¶ 24–27). The survey graded each employee on a scale of 1 to 5: "5" for work which exceeded requirements; "3" for work which met requirements; and "1" for work which did not meet requirements. (*Id.* ¶ 30). Each employee's supervisor was required to meet with a Human Resources representative who in turn completed a Supervisory Reference Form from each of the supervisor's reports. (Lauri Aff., Ex. D, pp. 41–42). This combined information was reviewed at a two-day meeting held on July 24 and 25, 1995 by the four vice-presidents in Circulation— Harry Woldt, Jr. ("Woldt"), Charles Shelton ("Shelton"), Lauretta Prestera ("Prestera") and Pollak (collectively, the "Decisionmakers"), who were 47, 38, 47, and 49 years old, respectively. (Def. 56.1 Statement ¶¶ 33, 34).

The number of employees in Circulation was reduced in four ways: (1) several management and support positions were eliminated outright; (2) the number of Home Delivery Managers was reduced as territories were both consolidated and closed; (3) the nature of the CSR position was changed from selling to small distributors to establishing partnerships with regional papers for third party deliveries and selling to national chains; and (4) the night CSR position was eliminated completely. (*Id.* ¶ 36). Following the July 24–25 meeting, 29 employees in Circulation were identified for termination. (*Id.* ¶ 37). These employees were permitted to accept the Buyout up to August 11, 1995. (*Id.* ¶ 38). Plaintiffs were all employed by The Times in Circulation and were terminated from their positions in that Department in August 1995. (Compl. ¶¶ 11–18).

Lawrence Helfand ("Helfand") began his employment with The Times in 1960 and was 53 years old when he was terminated. (Pl. Material Facts ¶¶ 1–2). Throughout his course of employment, Helfand received promotions to Assistant Director of the Home Delivery Department, Northeast Manager for Circulation, Transportation Manager, and finally to Home Delivery Manager for Southern New Jersey. (*Id.* § 57 4–7). Shelton, his direct supervisor, stated he "[didn't] recall anything outstanding or negative" about Mr. Helfand's performance. (*Id.* ¶ 9; Schneider Aff., Ex. C, pp. 23). Lauretta Prestera had personal knowledge of Helfand's performance, and the decision to terminate him was based on the evaluations presented at the meeting in July 1995. (Pl. Material Facts ¶ 10). Helfand received a rating of "3" on the Supervisory Reference Form. (Def. 56.1 Statement ¶ 58). Due to the reorganization plan, the Northern and Southern New Jersey territories were combined into

---

**3.** This elimination was primarily of the night CSRs because their function became obsolete after The Times purchased the wholesalers who distributed the newspaper.

one territory, and Susan Mills was chosen to manage this combined territory. Mills was 39 years old and received a "5" on her Supervisory Reference Form. (*Id.* ¶¶ 58–62).

Thomas Mathews ("Mathews") began working at The Times in 1983 as a newspaper carrier supervisor. (Pl. Material Facts ¶ 12). Upon termination he was 52 years old and held the position of National Northeast Home Delivery Group Manager, responsible for home delivery throughout the country except for the New York City Metropolitan area. (*Id.* ¶¶ 11, 17). Mathews alleges that he was never told anything was wrong with his performance and he never received negative criticism. (*Id.* ¶ 21). Prestera indirectly supervised Mathews when he served as the Northeast National Group Manager, and John Daly directly supervised him. (*Id.* ¶ 25). In the months prior to the downsizing in July 1995, at a meeting to change management, O'Sullivan alleges that when Mathews began to speak, Eric Rosen, a 39–year old National Sales Manager stated, "I guess he forgot to take his senility pills today." (Schneider Aff., Ex. J, pp. 108–109). Mathews, however, did not attribute any age-based comments to the Decisionmakers. (Lauri Aff., Ex. K, pp. 221–222). Prior to the July meeting, Mathews was asked to write evaluations of the seven employees who reported to him in addition to other individuals. Mathews alleges he was never told for what purpose these evaluations would be used. (Pl. Material Facts ¶¶ 31–33). Mathews received a "3" on his Supervisory Reference Form. (Def. 56.1 Statement ¶ 67). His position was reorganized, and the responsibilities were expanded and changed. (*Id.* ¶ 68). The Decisionmakers did not feel that Mathews possessed the necessary skills for this new position. They filled this position with David Chanler, 41, who had received a rating of "4–4.5" on the Supervisory Reference Form. (*Id.* ¶¶ 70, 71).

Howard Seiter ("Seiter") began his employment in 1976 and was 53 years old when he was fired. (Pl. Material Facts ¶¶ 34–35). Seiter was promoted several times, and in January 1995, Shelton offered him the position of Training Manager. He never directly reported to Pollak, but Pollak recalled that Seiter was "well recommended to become the training manager." (*Id.* ¶¶ 43–44). He was not directly supervised by Prestera. (*Id.* ¶ 46). Seiter received a "3" on the Supervisory Reference Form and was laid off because his position as Sales Training Manager was eliminated in the reorganization. (Def. 56.1 Statement ¶¶ 96, 97).

Maureen Moccia ("Moccia") was 56 years old when she was fired after 22 years with The Times. (Pl. Material Facts ¶¶ 47–48). Moccia received a rating of "4.75–5" but was fired because her position as Support Manager for Special Projects in Circulation was eliminated. (Def. 56.1 Statement ¶¶ 85, 86). Moccia alleges that two of her younger counterparts, Laura Pepper–Doyle and Nayda Mariette, who performed similar functions, were not terminated even though their ratings were lower. (Pl. Material Facts ¶¶ 54–57). Moccia was never denied a promotion and received all salary increases available to her. (*Id.* ¶ 58). Following her termination, Moccia applied for a position in the COF Department and was hired as of August 23, 1995. She received the same salary and benefits in this position as in her previous position in Circulation. (Def. 56.1 Statement ¶ 92).

James O'Sullivan had worked at The Times for 33 years when he was terminated in 1995 at age 50. (Pl. Material Facts ¶¶ 64–65). He worked in the accounting department, the advertising department and, as of 1980, in Circulation. (*Id.* ¶¶ 66–67). After several transfers he became the regional manager in Philadelphia. He was never demoted and never failed to receive a salary increase. (*Id.* ¶¶ 72–73). He never directly reported to Pollak. (*Id.* ¶ 75). O'Sullivan alleges that his supervisor, Ray Pearce, told him "that the person he intended to hire as a district manager

was too old." (*Id.* ¶ 79). O'Sullivan did eventually hire a man in his 50's. Pearce allegedly responded "that he did not want an older individual hired as a manager because he would not have enough energy to do the job." (*Id.* ¶ 80). Pearce was 35 in 1995. (*Id.* ¶ 81). O'Sullivan also alleges that at a town meeting in late 1994 or early 1995, Arthur Sulzberger, Jr., the Publisher of The New York Times, stated that "if you are a manager over 40 in The New York Times your career was pretty much over." (Schneider Aff., Ex. J, p. 150). When asked about this incident, Mathews, also present at the town meeting, stated that he recalled Sulzberger's saying that "white males were an endangered species." (Lauri Aff., Ex. K, p. 222). Mathews could not recall if there was a reference to age or not. (*Id.*) O'Sullivan received a rating of "3" on the Supervisory Reference Form. (Def. 56.1 Statement ¶ 40). As part of reorganization, the Philadelphia office was closed and, thus, O'Sullivan's position was eliminated. The Philadelphia territory was taken over by Paul Brown, 44, who received a rating of "4". (*Id.* ¶¶ 42–45).

Kenneth Mooney was 49 years old and had been working at The Times for 31 years when he lost his job in 1995. (Pl. Material Facts ¶¶ 84–85). He held many positions and, in 1993, Prestera asked him to become the Production Distribution Manager, requiring him to oversee individuals who would be monitoring the newspaper deliveries from the plants to the wholesalers. (*Id.* ¶ 94). Although Mooney received a rating of "4–5" on the Supervisory Reference Form, with the elimination of the night CSR positions, there were no employees requiring supervision. (Def. 56.1 Statement ¶¶ 75, 76). After his termination Mooney asked The Times for a list of available jobs. He alleges that he was given a list of openings for writers and reporters and was not advised of the openings in the COF Department. Mooney became aware of a position in COF when he saw the posting at The Times. Mooney applied for this position and was hired.

(Pl. Material Facts ¶¶ 97–99). He received the same salary and benefits in the COF Department as in his previous position in Circulation. (Def. 56.1 Statement ¶ 82). As a manager, Mooney was asked to provide oral evaluations for certain individuals whom he did and did not manage and alleges he was not informed that his evaluations would be used in the lay-off process. (Pl. Material Facts ¶ 101). One of the individuals that Mooney evaluated was plaintiff Enrique Edwards. Mooney denies that he gave Edwards a rating of "2" which appears on Edwards' evaluation form. (Schneider Aff., Ex. K, pp. 221–223). Mooney did not want to evaluate Edwards because he claims he "had no firsthand knowledge on what [he] should say." (*Id.* p. 222). Mooney does admit that he previously knew Edwards for six months. (*Id.*).

Sheila McCue ("McCue") began working at The Times in 1980 in the classified advertising department and was terminated at age 45. (*Id.* ¶¶ 103–104). McCue claims she never received any complaints or criticism from either Shelton or Pollak. (*Id.* ¶ 108). McCue reported directly to Kevin Cappallo and alleges he never complained about her performance. (*Id.* ¶ 112). Cappallo, however, gave her a rating of "2" on her Supervisory Reference Form and, as compared to other CSRs, viewed her as not sufficiently independent and lacking the ability to manage a large staff or larger territory necessary in the CSR position. (Def. 56.1 Statement ¶¶ 110, 113, 114).

Enrique Edwards was 57 years old when he was terminated after 27 years at The Times. He claims that he was consistently told that he was doing a good job by the managers including Shelton. (Pl. Material Facts ¶ 129). He received a rating of "2" from plaintiff Mooney, although Mooney denies that he gave this rating. (Schneider Aff., Ex. K, p. 221). The night CSR department was eliminated, thus Edwards had no employees to supervise, and

his position was terminated. (Def. 56.1 Statement ¶¶ 50, 52).

Benjamin Redmond began working at The Times in 1989 and was 50 years old when he was terminated. (Pl. Material Facts ¶ 131). Redmond never directly reported to Pollak, Shelton or Prestera and during his course of employment received two publisher's awards. (*Id.* ¶¶ 140, 143). He received a "2" on the Supervisory Reference Form and was one of the first Home Delivery Managers whose position was eliminated. (Def. 56.1 Statement ¶¶ 102, 104). Redmond's territory was taken over by Mary Ann Licata, 46, who had received a rating of "4" on her Supervisory Reference Form.

Each of the plaintiffs testified that no age-based comments were ever made by the Decisionmakers. (Def. 56.1 Statement ¶¶ 46, 54, 64, 72, 83, 94, 98, 106, 115). Circulation had 128 employees before firing 29 employees in August 1995. Before reorganization, 72% of the employees in Circulation were over 40 years old. After reorganization, 68% of the employees were over 40 years old. Furthermore, prior to August 1995, 77.5% of the managers were over 40, and after reorganization 74% were over 40. (Def. 56.1 Statement ¶¶ 117–122).

## DISCUSSION

■ Under the ADEA, employers may not discharge an employee by reason of his or her age if that employee is between the ages of 40 and 70. 29 U.S.C. § 623(a)(1), 631(a); *Woroski v. Nashua Corp.,* 31 F.3d 105, 108 (2d Cir.1994). The same analysis applicable to Title VII claims applies to claims under the ADEA and the NYSHRL, *id.* at 108; *Raskin v. Wyatt Co.,* 125 F.3d 55, 60 (2d Cir.1997) (citations omitted), as well as to the other state and city anti-discrimination laws at issue here, *Alie v. NYNEX Corp.,* 158 F.R.D. 239, 243–44 (E.D.N.Y.1994) (New York City Charter and Administrative Code § 8–101); *Maidenbaum v. Bally's Park Place, Inc.,* 870 F.Supp. 1254, 1258 (D.N.J.1994) (New Jersey Law Against Discrimination,

§ 10:5–1), *aff'd,* 67 F.3d 291 (1995); *Kelly v. Drexel University,* 907 F.Supp. 864, 871 (E.D.Pa.1995), *aff'd,* 94 F.3d 102 (1996) (Pennsylvania Human Relations Act, 43 P.S. § 951–963); *Bridgeport Hosp. v. Comm'n on Human Rights & Opportunities,* 232 Conn. 91, 108, 653 A.2d 782 (1995) (Connecticut Fair Employment Practices Act, G.S. §§ 46a–51).

Summary judgment should not be granted "unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *see* Fed.R.Civ.P. 56(c). *See generally Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An issue of fact is genuine when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome of the particular litigation if the substantive law at issue so renders them. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The burden of establishing that no genuine factual dispute exists rests on the party seeking summary judgment. *Chambers,* 43 F.3d at 36. "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial," however, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995); *accord Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223–24 (2d Cir.1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The moving party, in other words, does not bear

the burden of disproving an essential element of the nonmoving party's claim.

If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir.1994). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Instead, the nonmovant must " 'come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely ... on the basis of conjecture or surmise.' " *Trans Sport v. Starter Sportswear*, 964 F.2d 186, 188 (2d Cir.1992) (citation omitted).

In assessing materials such as affidavits, exhibits, interrogatory answers, and depositions to determine whether the moving party has satisfied its burden, the court must view the record "in the light most favorable to the party opposing the motion" by resolving "all ambiguities and draw[ing] all factual inferences in favor of the party against whom summary judgment is sought." *Chambers*, 43 F.3d at 36. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a *reasonable* inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Id.* at 37 (emphasis added).

It often is difficult to apply summary judgment analysis in employment discrimination cases because they necessarily turn on the intent of the alleged discriminator, and plaintiffs will rarely uncover direct evidence of discriminatory intent. *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464–65 (2d Cir.1989). Nonetheless, a plaintiff must produce some evidence from which a reasonable inference of discrimination can be drawn. *McLee v. Chrysler Corp.*, 109 F.3d 130, 134–35 (2d Cir.1997). For a discrimination plaintiff to survive a

motion for summary judgment he must do more than present " 'conclusory allegations of discrimination;' " *Duprey v. Prudential Insur. Co. of America*, 910 F.Supp. 879, 883 (N.D.N.Y.1996) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985)); "he must offer 'concrete particulars' to substantiate [his] claim." *Id.*

To address these concerns, in discrimination cases under the ADEA, courts apply the same three-part test, announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny, as they apply in other statutory discrimination cases. *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 721–22 (2d Cir.1994) (applying the *McDonnell Douglas* standard to handicap discrimination claim brought under the Rehabilitation Act); *Duprey*, 910 F.Supp. at 883. Under this standard, a plaintiff bears the initial burden, albeit minimal, of establishing a prima facie case of disability discrimination. *See Fisher v. Vassar College*, 114 F.3d 1332, 1340 & n. 7 (2d Cir.1997) (in banc) (collecting cases), *cert. denied*, —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); *Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 383 (2d Cir. 1996).

If plaintiff establishes his or her prima facie case, the burden of production shifts to the defendant to produce "an explanation to rebut the prima facie case—*i.e.*, the burden of producing evidence that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.' " *Fisher*, 114 F.3d at 1335 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–07, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (quoting *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1093)). As the Court of Appeals noted in *Fisher*, "[a]ny legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case." 114 F.3d at 1336. Accordingly, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons in order to nullify the presumption and obligate the plaintiff to

satisfy the burden of proof." *Id.* (quoting *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094).

■ Once a defendant has met its burden, "the presumption that triggered the defendant's burden of production ... 'drop[s] out of the picture'" *Id.* (*quoting Cabrera v. Jakabovitz,* 24 F.3d 372, 382 (2d Cir.1994) (*quoting St. Mary's,* 509 U.S. at 509, 113 S.Ct. at 2748)). The "factual inquiry proceeds to a new level of specificity," *St. Mary's,* 509 U.S. at 516, 113 S.Ct. at 2752; *Fisher,* 114 F.3d at 1336, and the burden shifts back to plaintiff to put forth adequate evidence to support a rational finding that the "legitimate non-discriminatory reasons proffered by the employer were false, and that more likely than not the employee's [age] was the reason for [the adverse decision.]" *Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 129 (2d Cir.1996), *cert. denied,* 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997). Plaintiffs need not show that age was the only factor in the employer's decision. *See Charrette,* 806 F.Supp. 1045, 1060 (N.D.N.Y.1992) (citing *Montana v. First Federal,* 869 F.2d 100, 105 (2d Cir.1989) (citations omitted)). Nor must plaintiffs demonstrate that defendant's "'proffered reason is false, but only that its stated reason was not the only reason and that age did make a difference.'" *See Charrette,* 806 F.Supp. at 1060 (quoting *Montana,* 869 F.2d at 105 (citation omitted)). If, however, in the last analysis, plaintiffs are "'unable to show evidence from which a jury could infer discrimination ..., then summary judgment may be granted.'" *See Charrette,* 806 F.Supp. at 1061 (quoting *Diamantopulos v. Brookside Corp.,* 683 F.Supp. 322, 328 (D.Conn.1988) (citations omitted)). In all cases, the plaintiff always "retains that ultimate burden of persuading the [trier of fact] that [he] has been the victim of intentional discrimination." *Fisher,* 114 F.3d at 1336 (*quoting St. Mary's,* 509 U.S. at 508, 113 S.Ct. at 2747–48 (*quoting Burdine,* 450 U.S. at 256,

101 S.Ct. at 1095 (alteration in *St. Mary's* ))).

Merely showing that the employer's proffered reason is pretextual—that the stated reason is not the real reason—will not necessarily carry the plaintiff's ultimate burden of persuasion. Rather, the plaintiff must also demonstrate that the true reason was an illegally discriminatory one. *Fisher,* 114 F.3d at 1338; *see St. Mary's,* 509 U.S. at 515, 113 S.Ct. at 2752 ("[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason.").

## I. *Plaintiffs' Prima Facie Case*

For purposes of this motion only, defendant concedes that plaintiffs can establish their prima facie case within the *McDonnell Douglas* framework.

## II. *Defendant's Legitimate Non–Discriminatory Reason*

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a non-discriminatory justification for the termination. As the Court of Appeals has noted, "[a]ny legitimate, nondiscriminatory reason will rebut the presumption triggered by the prima facie case." *Fisher,* 114 F.3d at 1336.

■ The Court of Appeals has held that plaintiff's prima facie case of age discrimination is rebutted by evidence that "at the time it discharged [plaintiff a] company was in a business downturn and that a reduction-in-force was necessary to meet its budgetary goals." *Gallo,* 22 F.3d at 1226; *Viola v. Philips Med. Sys. of N.A.,* 42 F.3d 712, 717 (2d Cir.1994) (employer's "evidence that it implemented a business-justified, company-wide reduction in its work force in response to changes in business emphasis and economic necessities, and it relied upon non-discriminatory guidelines in selecting employees to be fired," rebutted plaintiff's prima facie case); *Woroski,* 31 F.3d at 109 (defendant

rebutted plaintiff's prima facie case where it "presented evidence to demonstrate that it discharged [plaintiffs] as part of a business-justified company reduction-in-force, conducted on an unbiased basis"). As noted above, courts are not to interfere with the employer's business judgment so long as that judgment is not exercised for discriminatory reasons. *E.g., Montana v. First Federal Savings and Loan Assn. of Rochester*, 869 F.2d 100, 106 (2d Cir.1989) ("Certainly the court could not merely substitute its judgment for that of a business judgment, nor could it determine that [the employer] should more properly have released another instead of [plaintiff]."); *Parcinski v. Outlet Co.*, 673 F.2d 34, 37 (2d Cir.1982) ("The [ADEA] does not authorize the courts to judge the wisdom of a corporation's business decisions"); *Coleman v. Prudential Relocation, supra*, 975 F.Supp. at 239; *see Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir.1980) ("When a decision to hire, promote, or grant tenure to one person rather than another is reasonably attributable to an honest even though potentially subjective evaluation of their qualifications, no inference of discrimination can be drawn"); *Pisana v. Merrill Lynch & Co., Inc.*, 1995 WL 438715 at *4 (S.D.N.Y.1995) ("Employers are free to terminate employees for subjective business judgments so long as their actions are not taken for discriminatory reasons").

■ The defendant has clearly met its burden in rebutting plaintiffs' prima facie case by offering numerous affidavits and depositions demonstrating the non-discriminatory basis for its decisions to discharge plaintiffs. Defendant's 56.1 Statement details without contradiction the impact that the recession of the 1990's had on revenue of The Times. In response to this economic decline, The Times sought to reduce its staff and reorganize a number of departments, including Circulation. Defendant first instituted the Buyout but was forced to resort to lay-offs when the Buyout proved unsuccessful. As described above, the elimination of certain positions and employees was handled through an objective process. Self-evaluations and supervisory evaluations were used at a two-day meeting of the four vice-presidents in Circulation in order to evaluate the skills and abilities of each employee and, eventually, make decisions regarding discharge.

There were several ways in which an employee could be terminated. First and foremost, those employees who lacked the skills and abilities to perform the functions of their jobs in relation to their peers were terminated. Second, those employees whose positions were eliminated because of reorganization were also let go. As noted above, O'Sullivan, Helfand and Redmond each received either a "2" or a "3" on the Supervisory Reference Form. Each worked in a position that was to be enlarged by the combination of numerous territories, requiring the elimination of a manager. Each was replaced by another manager who had received either a "4" or a "5" on the Supervisory Reference Form. O'Sullivan was replaced by Paul Brown, 44, Helfand was replaced by Susan Mills, 39, and Redmond was replaced by Mary Ann Licata, 46. (*See* Miele Aff., Exs. 19, 22, 29; Lauri Aff., Ex. B, p. 126, Ex. J, p. 162, Ex. O, pp. 118–119).

Edwards, Mathews, Mooney, Moccia and Seiter were all terminated because the reorganization plan eliminated their positions. Edwards and Mooney supervised night CSRs who were responsible for supervising the vendors of The Times; but the night CSR position was eliminated entirely when The Times purchased those vendors. Thus, there were no employees for Edwards or Mooney to supervise. (Lauri Aff., Ex. B, pp. 140–142) Mathews, who received a "3" on the Supervisory Reference Form, lost his position when it was expanded and the Decisionmakers did not find him to be qualified to manage the reorganized position. (*Id.* at pp. 130–33). The positions of Moccia and Seiter were

also eliminated as part of the reorganization plan. (*Id.* at pp. 128–33, 139–41). McCue, a CSR, received a "2" and was determined not to possess the ability to manage a larger staff or an expanded territory as would be necessary in the reorganized CSR position. (*Id.* at pp. 124–125). Moccia and Mooney, who received the highest ratings of all the plaintiffs, were subsequently rehired in the COF Department with the same salary and benefits as in Circulation.

Accordingly, defendant has met its slight burden to rebut plaintiffs' inference of discrimination—it has articulated a legitimate, non-discriminatory reason for its conduct, which is required in order to "prevent employers simply from remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Fisher,* 114 F.3d at 1335.

### III. *Pretext for Age Discrimination*

Plaintiffs fail to make an express argument as to pretext as used in the *McDonnell Douglas* framework. After close scrutiny, however, plaintiffs' apparent position is that the selection process utilized by the Decisionmakers was subjective and flawed and that their discharge was pretextual in light of their excellent employment records. I find that the evidence upon which plaintiffs rely to demonstrate pretext is insufficient, even if believed, to permit a factfinder to find The Times' proffered explanation for the discharges is pretextual. I will address each of plaintiffs' arguments below.

#### A. *Subjective Process*

■ Plaintiffs claim the selection process used by the Decisionmakers was "hasty and superficial." (Pl. Opp. Mem. at 13–14). They state that the whole process occurred within a three-day period less than one week prior to the two-day meeting on July 24 and 25. Mathews and Mooney claim that, as managers, they were responsible for evaluating those employees who worked under them. They

allege that they did not know that the information they were providing was being used by the Decisionmakers in determining who to fire, (Schneider Aff., Ex. K, pp. 143–46, Ex. G., pp. 168–69), although they nowhere articulate the basis for the apparent implication of their argument, *i.e.,* that they would have given different responses had they known the intended use of the evaluations.

Plaintiffs also assert an unsupported objection to defendant's reliance on the numerical ratings given to the employees, claiming they are both invalid and inaccurate. (Pl. Opp. Mem. at 13). Furthermore, plaintiffs claim that the Decisionmakers did not review the materials before the meeting and did not even review them personally at the meeting. Rather, they complain that the evaluations were read to them by a Human Resources representative. (Lauri Reply Aff., Ex. S, pp. 113–116).

Defendant initially points out that the factual record does not support plaintiffs' arguments. First, Donna Miele's deposition explains in great detail the initial Voluntary Buyout Program for Circulation and the comprehensive selection process created to select the subjects of The Times' reduction-in-force. (Lauri Aff., Ex. D, pp. 39–41). The evaluation process included employees' own qualification surveys, training sessions with respect to those surveys, opportunities to meet with Human Resources representatives, and supervisors' evaluations. (*Id.*). Over the course of two days, this and other information was discussed by the four vice-presidents in order to select employees for discharge. (*Id.* at 46–47). The uncontradicted evidence does not permit the conclusion that the process was "hasty" or "superficial", and whether or not plaintiffs knew the purpose of the evaluation forms is irrelevant.

Second, although material in many of the employee folders was read to the Decisionmakers by a Human Resources repre-

sentative, the folders were available for review, and some were, in fact, read directly by the Decisionmakers when appropriate. (Laurie Reply Aff., Ex. S., pp. 113–116). Accordingly, the factual record does not support plaintiffs' argument on these points.

### 1. *Miele Notes*

In addition, plaintiffs argue that although Ms. Miele testified that all 129 employees were considered at the Decisionmakers' meeting, Miele's notes only included 49 employees and that, of those employees cited in her notes, only six were under 40 in July 1995. (Pl. Opp. Mem. at 12–13). Plaintiffs' characterization of Miele's notes, however, does not accurately reflect the uncontradicted testimony. It is undisputed that three lists were created at the two-day Decisionmakers' meeting; one list contained employees to be retained; one list reflected positions which would be eliminated; and one list reflected positions and individuals the Decisionmakers would discuss. (Lauri Reply Aff., Ex. S, pp. 113–115). The Times argues that Miele's notes, which have never been put forth as an official record of the meeting, merely represent the third list of individuals, those who required discussion. (*See* Def. Reply Mem. at 9). This assertion is corroborated by evidence in the record which shows that Miele's notes do not reflect any discussion of the other individuals who were also discharged as part of the process, including Humback, Paisley and Bookhardt, who were support staff, as well as Young, a secretary. (Miele Aff., Ex. 17; Schneider Aff., Ex. P). Accordingly, the undisputed evidence in the record does not support an inference that the process was so flawed as to be pretextual or an inference of age-related discrimination.

### 2. *Lack of Personal Knowledge*

Plaintiffs also argue that the Decisionmakers, in many instances, lacked "personal knowledge" or "direct supervision" as to each employee. As an aside, I note that

the personal knowledge plaintiffs suggest the Decisionmakers should have of each of the 129 employees would be both impracticable and unfeasible. More to the point, plaintiffs have cited no law stating that in a reduction-in-force context, the decisionmakers must have personal knowledge of each employee selected for discharge. Here, the Decisionmakers relied upon managers' appraisals, self-evaluations, and a combined 48 years of experience. While plaintiffs might have preferred that some other method of evaluation had been used, such preference is insufficient to raise a genuine issue of fact as to pretext.

Therefore, even if the process used by the Decisionmakers was subjective or flawed as argued by plaintiffs, it is not so subjective or so flawed as to rise to the level of proof from which a jury could find that the process was a pretext. *E.g., Coleman v. Prudential Relocation, supra,* 975 F.Supp. at 234 (in granting summary judgment for the employer, the Court held that even if "the factors relied upon by [defendant] are subjective and inaccurate ... this largely conclusory assertion is not probative of age discrimination.").

### B. *Employee Record*

■ Plaintiffs all assert that they either had excellent records, received numerous promotions, received full salaries and bonuses, or never heard a negative comment about their job performance. But in the context of a necessary reduction-in-force, an employee's work history is not relevant. *See Wado v. Xerox,* 991 F.Supp. 174, 214 (W.D.N.Y.1998) ("even capable employees with many years of service are going to be let go" when companies downsize). Furthermore, the Court of Appeals has consistently instructed the district courts not to substitute their business judgment for that of the employer. *See, e.g., Lieberman,* 630 F.2d at 67 (it is "not require[d] that the candidate whom a court considers most qualified for a particular position be awarded that position; it [is] require[d]

only that the decision among candidates not be discriminatory").

### 1. *Personal Beliefs*

■ Plaintiffs' personal beliefs of their qualifications are insufficient to support a claim of intentional discrimination. *See Holt,* 95 F.3d at 130 (plaintiff's attempt to show pretext is insufficient based only on "personal belief that she was the most qualified"); *Jugueta v. Perry,* 1997 WL 742535, at *6 (S.D.N.Y. Dec.1, 1997) (same); *Pisana v. Merrill Lynch & Co.,* 1995 WL 438715, at *4 (S.D.N.Y. July 24, 1995) (employer "is not obliged to prove the wisdom of its business judgments, so long as those judgments were not tainted by discrimination").

■ The law is also clear that allegations of replacement by younger workers do not, without more, prove discrimination. *See Futrell v. J.I. Case,* 38 F.3d 342, 348 (7th Cir.1994) (holding that "[t]ypically, younger workers will replace older ones; this is an unremarkable phenomenon that does not, in and of itself, prove discrimination"); *see also Coleman,* 975 F.Supp. at 242 (replacement by a younger person may be enough to satisfy the fourth element of plaintiff's prima facie case, but it is not enough to create an issue of fact about pretext); *Suttell v. Manufacturers Hanover Trust Co.,* 793 F.Supp. 70, 73–74 (S.D.N.Y.1992) (mere fact that younger, less-experienced employee assumed plaintiff's former duties after plaintiff was terminated was insufficient to give rise to inference of discrimination).

■ Each plaintiff was asked to articulate additional reasons, other than his or her age, to support his or her claim of discrimination. None of the plaintiffs offered anything to support a showing of pretext. O'Sullivan stated that based on his "performance record and [his] evaluations, there is nothing in there that would suggest ... that I was a poor employee or should be terminated." (Lauri Aff., Ex. D, p. 178). Edwards' only responses were

that he "was involved" and his unsupported conclusion that the discrimination was "based on [his] age." (*Id.,* Ex. I, p. 171). Helfand claims that in 35 years at The Times he was told he was a "superb employee" and that he "represented The New York Times to the highest degree." (*Id.,* Ex. J, p. 133). But when asked if he had any facts to support his contention that his termination was based on his age, he could not offer any reason other than his lack of criticism. (*Id.* at p. 134). Mooney was also asked the basis of his belief that The Times intentionally sought to lay off employees over 40. His belief came from learning that "all of the people that [The Times] laid off ... were all people over 40." (*Id.,* Ex. L, p. 159), a conclusion that is flatly contradicted by the undisputed evidence. (*Compare* Miele Aff. Ex. 8 *with* Ex. 17 as to Reilly, Koskerelos, Neuhof, Spivery, Paisley, Telehany). It is not disputed that Seiter was "well recommended" for promotion, (Schneider Aff., Ex. A, p. 43), yet he knew of no age-related comments in connection with the layoff. (Lauri Aff., Ex. N, pp. 127–128). McCue claimed only that she never received complaints or criticism and always heard "very positive feedback" from her manager. (*Id.,* Ex. P, pp. 66, 197). Redmond also stated his conclusion that the only reason for his lay-off was his age, (Lauri Aff., Ex. O, p. 81), not his lack of ability, noting his receipt of two publisher's awards. (Schneider Aff., Ex. N, p. 138). Mathews' response to the same inquiry was that he "was doing a very good job" and was "replaced with a much younger man." (Lauri Aff., Ex. K, pp. 226–227). Moccia also claims her "management and leadership skills far surpassed" other younger employees who "did the same job at one time or another." (*Id.,* Ex. M, pp. 77–78). Specifically, Moccia claims she was more qualified than both Laura Pepper–Doyle, 42, and Nadia Mariette, 49. Doyle received a rating of "4" and Mariette received a rating of "3.75". (*Id.* at pp. 77–78; Pl. Material Facts ¶¶ 54–57). As noted above, however, Moccia was rehired in the

COF Department with no loss of salary or benefits. Accordingly, this testimony by plaintiffs as to their personal beliefs of their superior qualifications and their beliefs that the layoffs were age-based because certain replacement workers were younger are not sufficient to raise an issue of fact as to pretext.

### 2. Steve Santos

Finally, I note that plaintiffs take issue with the retention of Steve Santos, 43, who received a poor evaluation from his supervisor. Santos was demoted, replacing Leslie Johns Smith, because the Decisionmakers believed he could perform better than Smith as representative for colleges and schools based on his previous success in that position. (Lauri Reply Aff., Ex. V, pp. 69–71). Plaintiffs have not proffered any evidence from which a factfinder could conclude that that belief was a pretext and thus have not raised a genuine issue of material fact as to Santos.

### IV. No Discriminatory Intent

Even if plaintiffs were able to raise an issue of fact as to pretext, they have not offered any evidence from which a jury could conclude that the true reason for their discharge was an illegally discriminatory one.

### A. Statistical Evidence

Plaintiffs argue that statistical evidence, showing a decrease in the percentage of employees over 40, supports a showing of discriminatory intent. See Ellis v. Provident Life & Accident Ins. Co., 926 F.Supp. 417, 427 (S.D.N.Y.1996) (holding that "[s]tatistics alone may indicate, but rarely sufficiently prove, ... discriminatory motive"), aff'd, 107 F.3d 2, 1997 WL 76861 (2d Cir.1997); Maresco v. Evans Chemetics, 1991 WL 90748, at *6 (S.D.N.Y.) (statistics "are not significant in age discrimination

cases unless the disparities in treatment are quite large") (quoting Grabb v. Bendix Corp., 666 F.Supp. 1223, 1246 (N.D.Ind. 1986)), rev'd on other grounds, 964 F.2d 106 (2d Cir.1992). But in making their argument plaintiffs rely only on the "management" and "CSR" reduction-in-force and exclude the "support staff" which was also subject to downsizing. Because the downsizing at issue here was department-wide, selective pools of employees are not an appropriate statistical measure. See Gray v. The Robert Plan Corp., 991 F.Supp. 94, 104 (E.D.N.Y.1998) (the court "harbor[ed] serious doubts that the [selected department], as opposed to the ... [entire department], is the proper pool of employees to look to for statistical purposes").

In Thayne v. New York State Electric & Gas Corp., the court held that a decrease from 64% to 61% of the percentage of employees over the age of 40 was insufficient to conclude that the reduction-in-force was a pretext for discrimination. 1997 WL 727617, at *9 (N.D.N.Y.1997). Here, prior to reorganization, 72% of Circulation was over 40. (Miele Aff., Exs. 8, 17). Following reorganization, 68% was over 40. (Id.). Viewing Circulation in its entirety, a decrease of four percent of the number of employees over age 40, from 72% to 68%, is insignificant and thus insufficient to raise an issue of fact as to discriminatory intent.[4]

### B. Moccia and Mooney

Although not argued by plaintiffs expressly within the McDonnell Douglas framework, I note that Moccia and Mooney's terminations from Circulation, despite their ratings of 4.75–5 and 4–5, respectively, also do not raise an inference of discrimination. The evidence is undisputed that both of their positions were eliminated, but they were rehired in other

---

4. Even if I look at "management" and "CSRs" without the support staff, the percentage also remains relatively stable: prior to reorganization 71% were over 40, and af-

terwards 65% were over 40. Furthermore, prior to August 1995, 77.5% of the managers were over 40, and after reorganization 74% were over 40.

positions at no loss of salary or benefits. Indeed, rather than raising any inference of discriminatory intent, the facts as to these two employees are probative of a *lack* of discriminatory intent.

### C. *Discriminatory Remarks*

The Court of Appeals has held that the bias of a non-decisionmaker is insufficient to prove an illegal motivation for an employer's discharge. *McLee*, 109 F.3d at 136 (allegations of bias against supervisor who was not consulted about a termination decision "provide no basis for imputing to [the decisionmaker] an invidious motivation for the discharge"); *see also Legendre v. Chase Manhattan Bank*, 1996 WL 514874, at *6 (S.D.N.Y. Sept.10, 1996) (alleged discriminatory remark made prior to plaintiff's discharge insufficient to establish an inference of discrimination without "competent evidence" that the coordinator played a role in plaintiff's discharge); *Jaffe v. Aetna Cas. & Sur. Co.*, 1996 WL 337268, at *6 (S.D.N.Y. June 19, 1996) (granting summary judgment in Title VII discharge case and noting "[m]ost significantly, the offending comment in the instant case was not even made by a decisionmaker"), *aff'd*, 113 F.3d 1229, 1997 WL 289862 (2d Cir. 1997).

■■■■ Plaintiffs allege that Ray Pearce and Eric Rosen, both managers, made age-related discriminatory remarks. Even if taken as true, this does not support their claim because Pearce and Rosen were uninvolved in the decisionmaking process. Plaintiffs also allege that the Publisher of the New York Times, Arthur Sulzberger, Jr. made a discriminatory ageist remark. First, this comment appears to be rhetorical hyperbole made in the context of discussing a diversification program at The Times. Plaintiff Moccia stated in her deposition that Sulzberger has been known to say "strange things, joking things." (Lauri Aff., Ex. M, p. 133). Second, there is disputed testimony as to if he did, in fact, refer to "white males over 40", but, because this is a motion for summary judg-

ment, I resolve all ambiguities in favor of the nonmoving party. Third, despite Sulzberger's high position at The Times, he was not one of the decisionmakers in this selection process. Each plaintiff has stated in his or her individual deposition that the four Decisionmakers did not make any ageist remarks. Thus, as the court in *Burrell v. Bentsen* stated, "'stray remarks in the workplace,' 'statements by non-decisionmakers,' and 'statements by decisionmakers unrelated to the decisional process' are not by themselves sufficient to satisfy plaintiff's burden in proving pretext." 1993 WL 535076, at *8 (S.D.N.Y. Dec.21, 1993) (quoting *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 448 (8th Cir. 1993), *aff'd*, 50 F.3d 3 (2d Cir.1995)); *see also Mauter v. Hardy Corp.*, 825 F.2d 1554, 1558 (11th Cir.1987) (company Vice President's ageist remark insufficient to show pretext because he "played no part in the decision to terminate the plaintiff"). In sum, I find plaintiffs have failed to proffer any evidence which, if believed by the jury, would permit the finding that plaintiffs' terminations were age-based.

### CONCLUSION

For the reasons detailed above, defendant's motion for summary judgment is granted.

The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED.