**David C. EMANUEL, Plaintiff,**

v.

**OLIVER, WYMAN & COMPANY, LLC, and John Drzik, Defendants.**

**No. 98 Civ. 5405(DC).**

United States District Court, S.D. New York.

March 9, 2000.

---

Alfred E. Smith, Robert J. Barsch, New York City, for plaintiff David C. Emanuel.

Piper Marbury Rudnick & Wolfe LLP, Oliver, Wyman & Company, LLC and John Drzik by Robert A. Meister, Dina S. Glassman, New York City, for defendants.

## OPINION

CHIN, District Judge.

In this employment case, plaintiff David Emanuel alleges that defendants, a financial consulting firm and its president, unlawfully terminated his employment because of his age. Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendants present compelling evidence that Emanuel was terminated not because of his age but because of his poor job performance—specifically, because he lacked the communication, management, and leadership skills required of a senior employee. Moreover, the undisputed evidence shows that plaintiff was hired when he was forty-seven years old, that he was fired just eleven months later when was he was forty-eight years old, and that the same person who fired him hired him. Plaintiff has presented no evidence that defendants' proffered nondiscriminatory reason for terminating his employment is false. On the record before the Court, no reasonable jury could conclude that defendants discharged Emanuel because of his age. Defendants' motion is therefore granted and the complaint is dismissed.

## BACKGROUND

### A. *The Facts*

Construed in the light most favorable to plaintiff, the facts are as follows:

#### 1. *Plaintiff's Employment with Defendant*

Defendant Oliver, Wyman & Company, LLC ("OWC") is a strategy consulting firm dedicated to the financial services industry. Defendant John Drzik is the President of OWC.

Emanuel was forty-seven years old when OWC hired him as the Global Head of Research in June 1996. Drzik outlined plaintiff's job responsibilities in a letter dated June 4, 1996. OWC expected Emanuel to carry out specified substantive research duties and to "provide leadership and direction" to the three or four consultants he would supervise in the research department. (Meister Decl., Ex. 6 at 2). In addition, Emanuel was expected to "interact with [OWC's] clients" and have "substantial contact with ... OWC Directors." (*Id.*). OWC anticipated that Emanuel would be considered for a director position within a year of his hiring. (*Id.*). The June 4 letter also detailed Emanuel's annual compensation, which consisted of a combination of salary and bo-

nus, guaranteed to equal at least $200,000. (*Id.*).

In fact, after his employment commenced, plaintiff had substantial contact with OWC's directors and consultants, working on research projects and generally acting as a "problem solver" for the firm. (Emanuel Decl., ¶ 10). In addition, Emanuel supervised a staff of three consultants in the research department—Natasha Haase, Andy Hickman, and Til Schuermann.[1]

### 2. *Plaintiff's Work Performance*

Emanuel's performance was disappointing in certain respects from the outset. Although plaintiff claims that he never received any "substantive" or "specific" negative feedback regarding his communication and management skills (Emanuel Decl., ¶¶ 10, 12, 13), he concedes that on numerous occasions, various OWC directors, including his direct supervisor, Drzik, made him aware that he was not performing up to expectations in those areas. (*See* Smith Decl., Ex. 1 [2] at 46–47, 67–70, 78–80, 86).

For example, Emanuel had only been at OWC for about a week when he gave an "impromptu, without notes, without slides" oral presentation at a firm gathering where he was introduced as Global Head of Research; an OWC director, Peter Carroll, told plaintiff that "it wasn't a good idea to do that kind of presentation" and that he "probably shouldn't have given the speech without slides." (Smith Decl., Ex. 1 at 46–47; *see also* E. Smith Decl., ¶ 5). Emanuel later received more negative feedback from Carroll; in August or September 1996, Carroll told plaintiff that he "was not doing too well." (Smith Decl., Ex. 1 at 79).

Similarly, in September or October of 1996, Elaine Smith, OWC's chief financial officer, told Emanuel that she thought he might be "hav[ing] trouble getting assimilated." (*Id.* at 68). Smith had other conversations with plaintiff during his tenure at OWC, during which she told him that his performance was poor and that "his communication style was not in line with the firm's norm" because he was "verbose and rambling." (E. Smith Decl., ¶ 6). Drzik also criticized Emanuel's performance; in November 1996, after Emanuel orally presented a report to an OWC committee of directors, Drzik told him that his presentation had not been satisfactory. (Smith Decl., Ex. 1 at 70).

Prompted by the negative feedback he had received and recognizing that he "could use a bit more help," Emanuel took a one-day course to improve his communication skills in August 1996. (Smith Decl., Ex. 1 at 108; *see also* Emanuel Decl., ¶ 10). OWC supported Emanuel's participation in the seminar; indeed, the firm paid for the course. (Smith Decl., Ex. 1 at 108–10).

Despite plaintiff's efforts, the negative feedback from OWC directors and officers continued into 1997. At Emanuel's performance review in January 1997, Drzik described to plaintiff in detail the various concerns expressed by the firm's directors about plaintiff's performance. Emanuel recalls that Drzik criticized his lack of preparation for presentations and that he and Drzik discussed Emanuel's style of communication. (Smith Decl., Ex. 1 at 86, 104). In addition, Drzik told plaintiff that the research staff had complained about his supervision of them, and suggested that plaintiff "back off" from the consultants. (*Id.* at 58–59, 61–63, 66, 103). Drzik also listed several projects that he expected Emanuel to complete by the end of the year. (*See id.* at 98–99, 105).

After the January 1997 review, plaintiff claims that he acted upon several of Drzik's suggestions on how to improve his

---

**1.** A fourth consultant, Max Abramowitz, joined Emanuel's staff in January 1997.

**2.** References to Exhibit 1 of the Smith Declaration refer to Emanuel's deposition testimony.

communication skills. (*Id.* at 121–22). For example, in approximately March 1997, Emanuel attended an in-house seminar on giving presentations, led by an OWC director, Harvey Weinberg. (*Id.* at 113, 126, 131). At some point, OWC suggested that Emanuel take another communication seminar, but he did not do so. (*Id.* at 106). In addition, at another unspecified point, OWC suggested that Emanuel receive further in-house training on making presentations, but it is unclear whether he received any such instruction. (*Id.* at 112–114).

In addition to the concerns expressed by OWC directors and officers, concerns were raised by Emanuel's staff of research consultants. Emanuel was aware that the three consultants he supervised had complained to Drzik and other OWC directors about Emanuel's poor supervisory and management skills. (Smith Decl., Ex. 1 at 52–55, 57–63, 66, 103). For example, soon after Emanuel was hired, Natasha Haase asked to be transferred out of the research group because she was "frustrat[ed]" by Emanuel's communication, supervisory, and managerial skills. (Haase Decl., ¶ 4). Specifically, Haase testified that Emanuel called meetings without an agenda or even a stated purpose, that he once left a rambling hour-long voice-mail message for her, and that he had distracting and unprofessional personal habits. (*Id.*). Haase found plaintiff's skills to be so deficient that she believed he was a hindrance to her professional development. (*Id.*). She concluded that she could not effectively work under Emanuel, asked an OWC director if she could be reassigned to another department within the firm, and was in fact transferred to another position. (*Id.* at ¶ 5–6). Emanuel acknowledges that he "got [a] sort of reaction from [Haase]" that she could not work with him. (Smith Decl., Ex. 1 at 53). Haase returned to the research department after Emanuel was fired.

The other two consultants on Emanuel's staff also complained about him to OWC directors. According to Andy Hickman and Til Schuermann, plaintiff was "exceedingly difficult to work with" because he "constantly interfer[ed]" in their work and seemed resentful when other OWC consultants took their research questions to Hickman or Schuermann rather than plaintiff. (Hickman Decl., ¶¶ 4, 5; *see* Schuermann Decl., ¶¶ 3, 6). In addition, Hickman and Schuermann assert that Emanuel was "a poor verbal communicator" who was unable to speak concisely and coherently. (Schuermann Decl., ¶ 5; Hickman Decl., ¶¶ 4–5). Schuermann states that plaintiff also had "extraordinarily poor" management abilities, in that he was unable to prioritize research requests and was ineffective at allocating assignments among his staff. (Schuermann Decl., ¶ 4). Both Schuermann and Hickman took their complaints to OWC management; Hickman even told Drzik that he would quit if things did not change. (Schuermann Decl., ¶ 7; Hickman Decl., ¶ 6). Drzik informed Emanuel of the consultants' complaints at the January 1997 review and on other occasions, and Emanuel admits to being told of his staff's unhappiness with him. (Smith Decl., Ex. 1 at 57–59, 61–63, 103, 116–18; Ex. 2 at 104–05).

Defendants documented the various complaints voiced about Emanuel's poor performance. As mentioned above, in January 1997, Emanuel and Drzik met for Emanuel's annual performance review. Drzik drafted a written assessment of Emanuel prior to the meeting; a handwritten note at the top of the document reads, "Delivered by Drzik = 1/14/97." (Meister Decl., Ex. 4). The written evaluation highlighted Emanuel's positive contributions to OWC, but also memorialized the numerous specific criticisms of his communication and management skills expressed by OWC's directors and consultants and noted that "there are a number of areas in which David needs to improve." (*Id.*). Drzik also listed specific actions that he expected plaintiff to take to improve his

performance, as well as more general suggestions of how plaintiff could fulfill his job responsibilities more effectively. (*Id.*) Plaintiff concedes that the written assessment is an accurate summary of what Drzik told him at the January 1997 review. (Smith Decl., Ex. 1 at 120).

Specifically, the written review noted that the "primary area of discontinuity [was] communication, both formal and informal." (Meister Decl., Ex. 4). By way of example, the written evaluation recounted the poorly-received formal presentations that drew negative comments from Carroll and Drzik, and observed that Emanuel's credibility had been hurt by these weak presentations. (*Id.*). The review also echoed the numerous complaints about Emanuel's verbal communication difficulties. Emanuel's expertise was characterized as "difficult to access" because of his communication weaknesses, and thus "some [d]irectors [were] less likely to approach him with client problems" (*id.*); this observation dovetails with the statements of Hickman and Schuermann that directors often came to them instead of Emanuel because of Emanuel's communication problems.

In addition, the written assessment documents defendants' other concerns with plaintiff's performance—the lack of initiative and management weaknesses for which Emanuel was eventually fired. Drzik noted that plaintiff was "less proactive and less focused than our firm's norm," particularly with regard to his participation in meetings with OWC directors. (*Id.*). Drzik further observed that after six months, Emanuel had not yet provided the "overall vision and leadership" to the research department that OWC expected of him. (*Id.*).

**3.** According to Drzik's notes, some of the specific "key issues" covered at the termination meeting and cited as reasons for plaintiff's discharge included Emanuel's "critical weakness" in communicating with OWC directors and making presentations, his "poor management abilities," particularly his management of Haase, Hickman, and Schuermann, and his

### 3. *Plaintiff's Discharge*

In the months following his January 1997 performance review, plaintiff continued to receive sporadic negative comments from OWC directors about his work. (Smith Decl., Ex. 1 at 124, 126, 129–31). In May 1997, Drzik again met with Emanuel and informed him that he was being fired. According to plaintiff, Drzik told him "you would have worked out real well here if we hired you ten or twenty years ago." (*Id.* at 137). Drzik does not recall using those words; instead, he remembers telling Emanuel that he "might have been more successful" with OWC if he had joined the firm earlier in his career. (Meister Decl., Ex. 2 at 81).

Afterward, Drzik memorialized in a written summary what had transpired, "to summarize the terms and circumstances surrounding [Emanuel's] departure." (Smith Decl., Ex. 2 at 98; *see* Meister Decl., Ex. 3). The post-meeting notes indicated that Drzik had explained to Emanuel that he was being terminated because of his weak oral communication skills, poor managerial abilities, and lack of initiative, problem areas that had been pointed out to Emanuel in January 1997. (Meister Decl., Ex. 3). Emanuel was discharged because he "ha[d] not responded successfully to feedback in January review and has therefore not developed in line with needs. Generally not working out as Global Head of Research, not seen as viable Director candidate." (*Id.*). Plaintiff disputes the accuracy of Drzik's post-meeting summary, claiming that the document lists several items that were not discussed at the May 1997 meeting. (Smith Decl., Ex. 1 at 143).[3]

"passive approach." (Meister Decl., Ex. 3). Plaintiff disputes the accuracy of Drzik's summary, and for purposes of this motion, I accept his account. I observe, however, that the criticisms contained in Drzik's notes are entirely consistent with all of the concerns that defendants had previously expressed to

After the termination meeting, Emanuel drafted a letter of reference for himself, and submitted it to Drzik for his signature. Drzik then drafted his own version, incorporating much of Emanuel's draft letter but making a few changes. (Smith Decl., Ex. 1 at 146–47; Ex. 8). In the letter, Drzik noted that Emanuel was a "reliable and capable ... subject matter expert" who could "write clearly and simply on complex subjects." (*Id.*, Ex. 8). No mention, positive or negative, was made of Emanuel's management or verbal communication skills.

As agreed at the May 1997 meeting, Emanuel remained at OWC until July 31, 1997, continuing to work on research projects and seeking a new position at the same time. (Smith Decl., Ex. 1 at 136).

### B. *Procedural History*

Emanuel has exhausted his administrative remedies. He filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") on March 9, 1998 and the EEOC issued Emanuel a right-to-sue letter dated April 30, 1998. On July 29, 1998, within ninety days of receipt of the right-to-sue letter, Emanuel commenced this lawsuit.

In his complaint, plaintiff alleges age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1), New York State Human Rights Law, N.Y.Exec.Law § 296, and N.Y.C.Admin.Code § 8–107(1)(a) & (6).[4] Emanuel seeks damages, costs, and attorney's fees. On September 21, 1998, defendants filed an answer denying the discrimination allegations and asserting affirmative defenses. After the parties completed discovery, this motion followed.

### DISCUSSION

### A. *Legal Standards*

#### 1. *Summary Judgment*

The standards governing motions for summary judgment are well settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. *See* FedR.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To create an issue for trial, there must be sufficient evidence in the record to support a jury verdict in the nonmoving party's favor. *See id.*

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *National Union Fire Ins. Co. v. Deloach*, 708 F.Supp. 1371, 1379 (S.D.N.Y. 1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (internal quotations omitted)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecommunications, Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996) (internal quotations omitted).

#### 2. *Age Discrimination*

■ In the absence of direct evidence of discrimination, a plaintiff in an ADEA em-

---

Emanuel at the January 1997 meeting and at other times.

**4.** Plaintiff has dropped his claim for breach of contract. (*See* Pl.Mem. at 2).

ployment discrimination case usually relies on the three-step *McDonnell Douglas* test. First, a plaintiff must establish a prima facie case of unlawful discrimination by showing that (1) she or he is a member of a protected class (2) who performed his or her job satisfactorily (3) who suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Stratton v. Department for the Aging,* 132 F.3d 869, 879 (2d Cir.1997). Second, if the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. *See Stratton,* 132 F.3d at 879; *Fisher v. Vassar College,* 114 F.3d 1332, 1335–36 (2d Cir.1997) (en banc), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). Third, if the defendant articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

█ To defeat a motion for summary judgment, the plaintiff must show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated at least in part by a discriminatory reason. *See, e.g., Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997). Because the defendant has at that point offered a nondiscriminatory reason for its actions, the plaintiff must usually show that the proffered reason is in reality a pretext for unlawful discrimination.[5] *See Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 317 (2d Cir.1999). The

substantive law under the New York Human Rights Law and the New York City Administrative Code is the same as under the ADEA. *See, e.g., da Cunha v. Globo Int'l Ltd.,* No. 97 Civ. 7989(MBM), 1999 WL 38177, at *5 (S.D.N.Y. Jan.28, 1999) (citing *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 4 (2d Cir.1995)).

## B. *Application*

Here, I assume that plaintiff has made out a prima facie case. Defendants have articulated a legitimate, nondiscriminatory reason for firing him, contending that Emanuel was terminated because he did not fulfill the responsibilities of his employment satisfactorily. Hence, rather than address each of the different steps of the different prongs of the *McDonnell Douglas* test, I proceed directly to the ultimate question of whether Emanuel has presented sufficient evidence from which a reasonable jury could find discrimination. I do so by evaluating first Emanuel's evidence, then defendants' evidence, and finally the record as a whole, keeping in mind the elusiveness of proof of discrimination and the principle that the jury is "entitled to view the evidence as a whole." *Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 314 (2d Cir.1997); *see also Siano v. Haber,* 40 F.Supp.2d 516, 520 (S.D.N.Y.), *aff'd mem.* 201 F.3d 432, 1999 WL 1295923 (2d Cir.1999); *Lapsley v. Columbia University–College of Physicians,* 999 F.Supp. 506, 515 (S.D.N.Y.1998).

### 1. *Plaintiff's Evidence*

#### a. *Age*

Plaintiff was forty-eight years old when he was fired. (Emanuel Decl., ¶¶ 5, 20).

---

**5.** A showing that the defendant's proffered reason for discharging plaintiff is pretextual is not *always* required. *See Renz v. Grey Adver., Inc.,* 135 F.3d 217, 222 n. 3 (2d Cir.1997) (proof of pretext is neither necessary to sufficient to establish liability); *Fields v. New York State Office of Mental Retardation & Develop-*

*mental Disabilities,* 115 F.3d 116, 121 (2d Cir.1997). As a matter of logic, however, where defendant articulates a nondiscriminatory reason for its action, proof that the offered reason is pretextual would obviously be helpful to plaintiff.

## b. *Discriminatory Comments*

Plaintiff states that over the course of his employment at OWC, Drzik and other OWC directors made repeated comments to him regarding his age. Plaintiff relies upon four such comments as evidence of age discrimination on the part of defendants. No reasonable jury could conclude, however, that two of those four comments were probative with regard to the issue of age discrimination.

■ First, plaintiff claims that an unnamed OWC employee stated that "if you hired into the firm out of college, you can retire at 47." (Smith Decl., Ex. 1 at 151). This remark was made during an orientation explaining the firm's retirement benefits and used as an example to illustrate OWC's retirement policy. The firm's directors are eligible for retirement benefits when the sum of their age and years of service add up to 70; if a person were hired at age 24, worked continuously at OWC, and became a director at age 47, that person would have 23 years of service. The sum of the age—47—and years of service—23—would equal 70. (*See* Def. Mem. at 8 & n. 2). Plaintiff admits that this remark was made during the benefits orientation and was not directed at him individually. (Smith Decl., Ex. 1 at 166). It constitutes no proof of discrimination.

■ Second, plaintiff states that Elaine Smith, OWC's chief financial officer, and Nikki Allen, OWC's head of human resources, told him that he had to treat "Generation Xers" differently than he would treat other people; Emanuel understood "Generation Xers" to refer to people in their twenties, and specifically, to the consultants who OWC hired right out of college. (*Id.* at 127–29). This remark was

not a comment on plaintiff's age, but rather was a statement about the characteristics of a generation raised in the late 20th century and weaned on the fast-paced culture of television and the Internet. "Generation X" has been described as a selfish and cynical group with a short attention span, a group that lives in the present and seeks immediate gratification.[6] Because of these characteristics, "Generation Xers" in the workplace might require a work environment different from the typical business atmosphere of the past—more "hand-holding," projects that would yield immediate results, instant feedback, and so on.[7] The "Generation Xers" comment was an indirect criticism of OWC's consultants; as part of "Generation X," they would share the unflattering characteristics of that group. Plaintiff claims that the comment implied that he would have "trouble dealing with the younger generation" (Emanuel Decl., ¶ 21), but such an interpretation is unreasonable; the comment suggests only that the younger people at OWC needed different treatment, not that Emanuel would have any difficulty in speaking to them.

The remaining two comments relied upon by plaintiff are arguably age-related and thus arguably constitute some evidence of discrimination. Plaintiff claims that OWC's chairman, Alex Oliver, told him to "stop shuffling around like an old man." (Smith Decl., Ex. 1 at 158; *see id.* at 90). In addition, Emanuel testified that at the May 1997 meeting at which he was terminated, Drzik told him that he "would have worked out real well here if we hired you ten to twenty years ago." (*Id.* at 137). The probative value of these statements is discussed below.

---

6. *See, e.g.,* Arlie Russell Hochschild, *Coming of Age, Seeking an Identity,* N.Y. Times, Mar. 8, 2000, at H1 (describing identity struggles of Generation X); Jeff Giles, *Generalizations X,* Newsweek, June 6, 1994, at 62 (recounting various descriptions of Generation X in the media).

7. *See Managers Grapple With New Generation of Workers,* The Tampa Tribune, July 28, 1997, at 21 (observing that as "Generation X ... move[s] into the workforce, managers are finding themselves in the position of working with a group of people they might not understand" and listing workplace needs of Generation Xers, such as instant gratification, fast feedback, and flexibility in work assignments).

### c. *OWC Statistics*

Plaintiff points to the statistics on the ages of OWC employees as further evidence of age discrimination at the firm. Emanuel notes that of the more than 160 employees at OWC at the time of his termination, only one other person, besides himself, who was not an OWC officer or a director was over the age of 40 years old. (Emanuel Decl, ¶ 22).

### d. *Replacement by Younger Person*

Plaintiff alleges that a younger person, Til .Schuermann, replaced him as Global Head of Research, an alleged fact that arguably gives rise to an inference of age discrimination by OWC. This contention is mere speculation on plaintiff's part; he has presented no concrete evidence to support a jury finding in his favor on this issue. In fact, the evidence demonstrates unequivocally that Emanuel was not replaced by Schuermann.

Schuermann himself states that he has not assumed plaintiff's position, either officially or unofficially. He does not hold the title "Global Head of Research," although he is sometimes described as the head of the research department because he is the most senior employee in that group. (Schuermann Reply Decl., ¶ 6). Schuermann has not assumed any additional job responsibilities, but rather continues to work as a research consultant with the same duties he had under Emanuel. (*Id.*, ¶ 3). He does not supervise the consultants in the research department, as Emanuel did when he was Global Head of Research. (*Id.*, ¶ 3). Moreover, Schuermann has not received a salary increase, as would be expected if he had been promoted to Emanuel's position. (*Id.*, ¶ 3, 5).

Indeed, the undisputed evidence demonstrates that Emanuel was not replaced at all, by a younger person or anyone else. Schuermann asserts that the position "Global Head of Research" no longer exists at OWC (Schuermann Decl., ¶ 6), and the declaration of Elaine Smith supports this conclusion. According to Smith, the position was created only when Emanuel was hired; she states that he was the only person to hold that title at OWC, and that the position has not been filled since plaintiff's departure. (E. Smith Decl., ¶¶ 3, 8; *see also* Smith Decl., Ex. 1 at 34).

█ As evidence of his claim that Schuermann replaced him, Emanuel states that from May to July of 1997, he "observed ... Schuermann fulfilling his duties as Head of Research." Defendants dispute this assertion, presenting evidence that Schuermann was either assigned to a different OWC office or on vacation for that entire period. (*See* Schuermann Reply Decl., ¶ 4). I assume for purposes of this motion that plaintiff's allegations are true. Even if true, however, there is still no issue of material fact as to whether Schuermann replaced Emanuel as Global Head of Research, for the fact that Schuermann may have assumed some of plaintiff's former responsibilities does not mean that he "replaced" Emanuel or "filled" his position. *See, e.g., Brennan v. Metropolitan Opera Ass'n,* No. 95 Civ. 2926(MBM), 1998 WL 193204, at *9 (S.D.N.Y. Apr.22, 1998), *aff'd* 192 F.3d 310 (2d Cir.1999) (citing *Wado v. Xerox Corp.,* 991 F.Supp. 174, 205 (W.D.N.Y.1998) ("[M]erely because [plaintiff's] duties continued to be performed by a younger person does not support an inference of age discrimination.")); *cf. Chastven v. Cigna Corp.,* No. 97 Civ. 6013(RPP), 1999 WL 1034753, at *8 (S.D.N.Y. Nov.12, 1999) (distributing terminated employee's former duties among several remaining employees does not constitute replacement by a younger employee).

█ The only other evidence presented by plaintiff in support of his speculation that Schuermann replaced him is a by-line on an article in the July 1999 issue of *Risk* magazine article that describes Schuermann as "head of research." (Smith Decl., Ex. 7). This evidence is insufficient for a reasonable jury to find in his favor on this issue. The fact that a publication uncon-

nected with OWC referred to Schuermann as "head of research" does not establish that he replaced plaintiff at OWC, particularly in light of the substantial evidence to the contrary. In addition, as Schuermann explained, as the most senior employee in the research group, he is referred to on occasion as the "head" of the department. On this record, no reasonable juror could conclude that Emanuel was replaced by a younger person.

### e. *Pretext*

Finally, plaintiff argues that defendants' stated reason for terminating his employment is pretextual and he contends that pretext is shown in three ways. First, Emanuel argues that although his job description contained "little or nothing about public communication or group presentations" and that "no mention was made of verbal communications," he was allegedly terminated for his shortcomings in these areas. (Pl.Mem. at 10; Emanuel Decl. at ¶ 11). This claim, however, is flatly contradicted by the documentary evidence offered by defendants. The June 4, 1996 letter that set out the terms of plaintiff's employment explicitly stated that Emanuel would have "substantial contact" with OWC directors "in relating [his research] findings" and would be expected to provide "leadership and direction" to his 3–4 person staff of consultants, functions that would obviously require verbal, public communications. (Meister Decl., Ex. 6). The job description also stated that Emanuel would "interact with clients as well as our staff," also a function that would necessarily entail oral communications. (*Id.*).

Second, Emanuel argues that the complaints about his poor management skills made by his staff are meritless because each consultant had a personal agenda to serve by making such allegations. For example, Emanuel implies that because

Schuermann replaced him as Global Head of Research and continues to serve in that position, he had an "obvious prejudice in this action" and an incentive to make statements to support defendants' motion. (*See* Emanuel Decl., ¶ 14; Pl.Mem. at 11). Plaintiff contends that the declarations of Natasha Haase and Andy Hickman are also tainted by their personal prejudice against him and in favor of defendants. (*See* Emanuel Decl. at ¶¶ 15, 16; Pl.Mem. at 11). Because the consultants' declarations are "highly questionable," they are meritless, plaintiff argues, and cannot be relied upon to support defendants' contention that plaintiff was fired for his management weaknesses.

This argument must also be rejected, for it ignores the fact that these three consultants voiced the same complaints about Emanuel during his tenure at OWC, before he was fired and long before he filed a lawsuit against their employer. The consultants' sworn statements repeat many of the complaints that were documented in the January 1997 written evaluation, drafted months before plaintiff's discharge. In addition, Emanuel concedes that he was informed about his staff's criticisms while he still worked at OWC. The consultants' declarations are not "highly questionable," as plaintiff contends, but are entirely consistent with their earlier statements about Emanuel's poor performance; this consistency demonstrates that the statements made in the declarations were not conjured up after the fact to support defendants' pretextual reason for firing plaintiff.[8]

■ Third, plaintiff points to the letter of reference drafted by Drzik as further evidence of pretext. In Emanuel's view, because Drzik wrote a reference letter "which sets forth that plaintiff's skills were excellent," he must have been terminated for a reason other than his lack of skill.

---

8. Even assuming that defendants were wrong in their belief that Emanuel was performing his work responsibilities poorly, "what is significant is that they based their decision to dismiss plaintiff on that belief, and not on his age." *Agugliaro v. Brooks Bros., Inc.*, 927 F.Supp. 741, 747 & n. 5 (S.D.N.Y.1996) (citing cases).

(Pl.Mem. at 11). No jury could reasonably accept this argument, however, for while it is true that Drzik drafted a reference letter that highlighted Emanuel's positive contributions to OWC, plaintiff exaggerates the strength of Drzik's assessment of his skills by glossing over the specific language of the letter. Drzik's letter touts only *specific* aspects of Emanuel's skills and does not anywhere represent that Emanuel's overall performance was "excellent." For example, Drzik described plaintiff as a "reliable and capable" subject matter expert who can "write clearly and simply on complex subjects." (Smith Decl., Ex. 8). The letter does not praise Emanuel's verbal communication or management skills, nor does it laud his initiative; it is in these areas that defendants claim Emanuel failed to live up to expectations.

In the end, plaintiff's evidence of pretext is nonexistent, and no reasonable jury could find that defendants' articulated reasons for firing plaintiff were a pretext for discrimination.

### 2. *Defendants' Evidence*

Defendants maintain that they fired plaintiff not because of his age, but because he performed poorly in his position as Global Head of Research. They have presented substantial evidence to support their contention.

#### a. *Age*

Although plaintiff was forty-seven when he was hired in June 1996, he was fired in May 1997, just eleven months later.

#### b. *Same Decisionmaker*

OWC President John Drzik both hired and fired plaintiff. Drzik testified that although several OWC directors and consultants met plaintiff prior to his hiring, the "final say" on the decision to hire Emanuel was "in [his] hands." (Smith Decl., Ex. 2 at 30–33). Drzik also drafted and signed the June 4, 1996 letter that set forth the terms of plaintiff's employment.

With respect to the decision to terminate plaintiff, Emanuel himself alleged in his complaint that Drzik made the decision to fire him eleven months after he was hired, and defendants admitted that fact. (*See* Compl. ¶ 16; Answer ¶ 11). Moreover, Drzik performed the actual firing of Emanuel at their May 1997 meeting.

■ When the same actor makes both the decision to hire the plaintiff and the decision to fire the plaintiff, the defendant is entitled to a strong inference that there was no discriminatory intent on the part of the employer. *See Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 560 (2d Cir.1997); *Brennan,* 1998 WL 193204, at *11. As the Second Circuit has observed,

> when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire. This is especially so when the firing has occurred only a short time after the hiring.

*Grady,* 130 F.3d at 560 (citations omitted); *see also Carlton v. Mystic Transportation Inc.,* 202 F.3d 129, 137 (2d Cir.2000).

Although plaintiff argues in conclusory fashion that a factual question exists as to whether Drzik made both the decision to hire him and the decision to fire him, defendants' evidence on this point is largely unrefuted. Emanuel surmises that because of the "corporate structure" and interview process at OWC, the decisions to hire and fire him must have been corporate decisions and not the responsibility of any one person. (*See* Pl.Mem. at 6–7; Emanuel Decl., ¶¶ 18, 23). He cites three facts in support of these conjectures: (1) he met with multiple people, the last being Oliver, prior to being hired; (2) Oliver signed two agreements relating to Emanuel's employment; and (3) Drzik's statement at the May 1997 meeting that he and Oliver had discussed Emanuel's termination. Plaintiff's proffered evidence can-

not support a jury finding in his favor on this issue, for several reasons.

First, the fact that plaintiff interviewed with several OWC employees before he was hired does not necessarily result in the conclusion that more than one person was responsible for the decision to hire him. Emanuel's meetings with several OWC directors and consultants prior to his hiring reflects a common practice, one that serves dual purposes; by meeting with several different people, a potential employee is given the opportunity to learn more about his possible co-workers and the company has the chance to receive more input with respect to the interviewee. While the various OWC employees who met with Emanuel may have expressed their views on his potential for. employment at the firm, there is no evidence that any of these people had any final authority over the decision to hire him.

Second, even assuming that Oliver and Drzik were equally responsible for the hiring and firing decisions, as plaintiff contends,[9] the strong inference that discrimination did not motivate the termination decision is still applicable when the same *two* individuals both hire and fire. *See Brennan v. Bausch & Lomb, Inc.*, 950 F.Supp. 545, 552 (E.D.N.Y.1997) (same two individuals both hired and fired plaintiff); *Ali v. Tribune Entertainment Co.*, No. 93 Civ. 1398(CSH), 1996 WL 384913, at *8 (S.D.N.Y. July 10, 1996) (same two individuals both promoted and fired plaintiff).

Third, with respect to the termination decision, plaintiff cannot create an issue of fact by conclusorily denying in his declaration and opposition papers his own prior allegation that Drzik made the decision to terminate him. (*Compare* Compl., ¶ 16, *with* Emanuel Decl., ¶ 23). As the Second Circuit has observed, "[t]he rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by

submitting an affidavit disputing his own prior sworn testimony." *Trans–Orient Marine Corp. v. Star Trading Marine*, 925 F.2d 566, 572–73 (2d Cir.1991) (citing cases). Defendants have presented persuasive evidence that Drzik was the "same actor" who both hired and fired Emanuel, and are therefore entitled to a strong inference that their decision was not motivated by discrimination.

### c. *Plaintiff's Documented Poor Performance*

Defendants adduce extensive evidence that plaintiff was terminated as Global Head of Research because he performed poorly in the position and that Emanuel was repeatedly warned well before he was discharged that he was failing to live up to company expectations. As detailed above, defendants cite numerous occasions, corroborated by plaintiff's own testimony, on which plaintiff performed his job responsibilities badly and received negative feedback directly from OWC directors afterward. OWC and Drzik have submitted the sworn statements of two directors and three consultants attesting to Emanuel's deficient performance. (*See* Haase, Hickman, Schuermann, and E. Smith Decls.; Meister Decl., Ex. 2 (excerpt from Drzik Dep.)). In addition, a contemporaneous document—the January 1997 written performance review—corroborates the directors' and consultants' accounts.

Moreover, plaintiff's own testimony shows that he was aware at various times during his tenure at OWC that he was not performing up to the level required by the firm. In late 1996 or early 1997, Emanuel thought that "things are not going as great as I would like ... things were not right." (Smith Decl., Ex. 1 at 129–30). Emanuel thought at one point in 1997, "I'm dead as it is," and later, he "figured that at the end of the year, [he] would get terminated." (*Id.* at 97). Finally, when he was fired in

---

**9.** For example, plaintiff points out that Oliver was the last person to interview him before he was offered the position at OWC and that

Oliver signed the non-compete and confidentiality agreements on behalf of OWC. (*See* Emanuel Decl., ¶¶ 18, 19).

May 1997, Emanuel admitted that he "sort of was expecting it." (*Id.* at 137).

### d. *Plaintiff's Position Remains Unfilled*

As discussed above, defendants present substantial evidence showing that plaintiff's position remains unfilled. On the record before the Court, no reasonable jury could find that plaintiff was replaced by a younger person.

### 3. *The Record as a Whole*

■ In light of the foregoing discussion of the parties' evidence, plaintiff's evidence of discrimination is reduced to essentially three items: (1) his age; (2) OWC's age statistics; and (3) two age-related comments. In context of the record as a whole, plaintiff's evidence is extremely weak. Even resolving all conflicts in the evidence and drawing all reasonable inferences in plaintiff's favor, I conclude that no reasonable jury could find that defendants terminated plaintiff's employment because of his age.

This is not a case in which the plaintiff was hired at a young age and then discharged once he became "too old" for the company. Instead, OWC hired plaintiff in June 1996, when he was forty-seven years old and fired him only eleven months later, in May 1997, one month after he had turned forty-eight. The fact that Emanuel was fired so soon after he was hired undercuts the argument that he was discharged because of his age; no reasonable juror could conclude that OWC fired Emanuel because he was a mere eleven months older than when he was hired. *See generally Brennan,* 1998 WL 193204, at *6 (no age discrimination where plaintiff was hired at age 46 and not rehired one year later); *Coleman v. Prudential Relocation,* 975 F.Supp. 234, 241 (W.D.N.Y. 1997) (no age discrimination where plaintiff hired at age 51 and discharged fourteen months later).

Plaintiff points to the statistics regarding the age of OWC employees as evidence of discrimination, noting that at the time he was fired, only one other OWC employee who was not a director was over the age of 40. I assume for purposes of this motion that plaintiff's statistics are correct, but the fact that the majority of OWC consultants were under the age of forty is of limited probative value on the question of discrimination in the context of this case. This statistic appears to be a reflection of the usual hiring practice in the consulting industry—a practice that is similar to the staffing of a law firm—rather than an indication of age discrimination. Consulting firms, like law firms, recruit their consultants (or associates, at law firms) directly out of undergraduate colleges (or law schools), and groom these young individuals into future directors (or partners). The majority of these new hires are under the age of forty because most graduating students are under the age of forty. Accordingly, OWC's lack of consultants over the age of forty does not necessarily suggest a pattern of age discrimination. I will give plaintiff the benefit of the doubt, however, and assume that the statistics present some evidence of discrimination.

■ Plaintiff also has presented two arguably age-related comments made by two OWC directors. Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff. *See, e.g., Campbell v. Daytop Village, Inc.,* No. 97 Civ. 4362(JSM), 1999 WL 292576, at *3 (S.D.N.Y. May 7, 1999); *Ruane v. Continental Cas. Co.,* No. 96 Civ. 7153(LBS), 1998 WL 292103, at *8 (S.D.N.Y. June 3, 1998) (citing *Spence v. Maryland Cas. Co.,* 995 F.2d 1147, 1155 (2d Cir.1993)); *Orisek v. American Inst. of Aeronautics & Astronautics,* 938 F.Supp. 185, 192 (S.D.N.Y. 1996). Here, plaintiff has demonstrated the requisite nexus with respect to only one of the two remaining age-based comments.

▐ Plaintiff cannot demonstrate any nexus between Oliver's comment that Emanuel should "stop shuffling around like an old man"[10] and the decision to discharge him. Plaintiff testified that he does not remember when Oliver made the comment to him (*see* Smith Decl., Ex. 1 at 90–91), and he has not offered any evidence that the remark was made close to his discharge. In fact, Emanuel's deposition testimony indicates that Oliver commented on his shuffling sometime in early 1997, months before Emanuel was fired.[11] Moreover, plaintiff has offered no evidence that the remark was related in any way to the decision to discharge him. *See Ruane*, 1998 WL 292103, at *8 (verbal comments constitute sufficient evidence of discrimination when such comments are, *inter alia*, proximate in time to the adverse employment decision and related to the employment decision at issue).

With respect to the remaining remark, Drzik's statement that Emanuel "would have worked out real well here if we hired you ten or twenty years ago" arguably indicates that Emanuel would have been more successful at OWC had he been younger.[12] As discussed above, the comment was made by the person who had authority over the decision to terminate plaintiff at the very meeting at which plaintiff was discharged, and appears to be related to the decision to fire Emanuel. *See Ruane*, 1998 WL 292103, at *8. This

fourth remark, therefore, serves as some evidence of discrimination on the part of OWC.

In response to plaintiff's discrimination claims, defendants have presented persuasive, largely unrebutted evidence that they did not discharge plaintiff because of his age but because of his poor job performance. In light of the sworn statements of several OWC directors and consultants attesting to plaintiff's unsatisfactory performance, the contemporaneous documentary evidence corroborating the directors' and consultants' criticisms of Emanuel, and plaintiff's own deposition testimony, a reasonable jury could only conclude that OWC discharged Emanuel because of his poor performance on the job and not because of his age. Moreover, as noted above, plaintiff presents no probative evidence demonstrating that defendants' proffered reason for terminating Emanuel—his poor job performance—is a pretext for discrimination.

In the end, plaintiff's evidence of discrimination boils down to three facts—his age at the time he was fired, the OWC age statistics, and Drzik's comments. While these facts may constitute some evidence of discrimination, they are insufficient to support a jury verdict in Emanuel's favor. *See Viola v. Philips Med. Sys.*, 42 F.3d 712, 716 (2d Cir.1994) ("A grant of summary judgment is proper only if the evi-

---

10. Defendants dispute the accuracy of plaintiff's version of Oliver's comment, noting that in his EEOC complaint, plaintiff stated that Oliver had told him to "not to shuffle around the office," with no comparison to an "old man." (*See* Meister Decl, Ex. 5). It was only later, at his deposition, that Emanuel added that Oliver had said "like an old man." (Smith Decl., Ex. 1 at 158). I assume here that plaintiff's deposition account is correct.

11. Emanuel stated that Oliver made the shuffling comment at a lunch attended by Emanuel and Oliver. (Smith Decl., Ex. 1 at 90). He then described a "later occasion" on which he and Oliver had another discussion about assimilating new employees into the firm, and stated that this later conversation took place in February or March 1997. (*Id.* at 93). Ac-

cordingly, the lunch at which the shuffling comment was made must have been before February or March of 1997.

12. Again, defendants take issue with plaintiff's account of what Drzik said; according to Drzik, he said something to the effect that if Emanuel had "joined [OWC] earlier in his career, he might have been more successful with the firm." (Meister Decl., Ex. 2 at 81). For purposes of this motion, I assume that Emanuel's version is correct. Defendants also offer their own interpretation of what Drzik meant to convey in making the remark, claiming that it was not related to plaintiff's age; as I draw all reasonable inferences in favor of the plaintiff, however, I assume that the statement did refer to Emanuel's age.

dence of discriminatory intent is so slight that no rational jury could find in plaintiff's favor.") (citation omitted); *Woroski v. Nashua Corp.*, 31 F.3d 105, 109–110 (2d Cir.1994) ("We recognize that plaintiffs did advance some evidence of age bias in the testimony about [plaintiff's supervisor's] statements. But some evidence is not sufficient to withstand a properly supported motion for summary judgment."). Accordingly, the motion for summary judgment must be granted.

## CONCLUSION

Defendants motion for summary judgment is granted and the complaint is dismissed, with prejudice. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.